Chartiers Valley Joint Schools, Appellant, *v.* Allegheny County Board of School Directors. Upper Merion Township School District, Petitioner, *v.* Boehm.

522

Argued April 22, 1965.   Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

*John A. Robb*, with him *Emerson G. Hess, Jr.*, and *Royston, Robb, Leonard, Edgecombe & Miller*, and *Hess, Hess & Bagley*, for appellants, in No. 24.

*Bernard G. Segal*, with him *Thomas B. Rutter*, *Ralph S. Snyder, William A. Schnader*, and *Schnader, Harrison, Segal & Lewis*, for intervenor-appellants, in No. 24, and for plaintiffs, in No. 226.

*John B. Nicklas, Jr.*, with him *Alan Miles Ruben*, Deputy Attorney General, and *McCrady & Nicklas*, for appellees, in No. 24.

*Walter E. Alessandroni*, Attorney General, with him *Byron H. LeCates*, Assistant Attorney General, *John P. McCord, Edward Friedman* and *Alan Miles Ruben*, Deputy Attorneys General, for Commonwealth, amicus curiae, in No. 24, and for defendants in No. 226.

OPINION BY MR. JUSTICE ROBERTS, June 30, 1965:

These two cases contest the validity of the School Reorganization Act of 1963[1] when tested against the provisions of the Constitution of Pennsylvania.

In the first case, four school districts[2] and two Pennsylvania taxpayers[3] filed a complaint in equity on May 5, 1964 in the Court of Common Pleas of Dauphin County, sitting as the Commonwealth Court, naming as

---

[1] Act of August 8, 1963, P. L. 564, §1 et seq., 24 P.S. §2-202 et seq. (Supp. 1964), amending the Public School Code of 1949, P. L. 30.

[2] School District of the Township of Upper Merion, School District of the Borough of West Pittston, School District of Bridgeport, and School District of the Borough of Bryn Athyn.

[3] West Chelton Corporation (a Pennsylvania corporation having its principal place of business in Jenkintown, Pennsylvania) and Roy Rose (a resident of Bryn Athyn, Pennsylvania).

defendants the Superintendent of Public Instruction, in that capacity and as chief executive officer of the State Board of Education, the Auditor General, the State Treasurer, and the Council of Basic Education. The complaint asserted that the School Reorganization Act[4] violated, in several respects, the Constitution of Pennsylvania and sought a decree declaring the Act unconstitutional, void, and unenforceable. More specifically, plaintiffs sought to restrain defendants: (1) from expending state funds for enforcement and effectuation of the Act; (2) from authorizing the payment of funds to any school district pursuant to the Act; (3) from approving, authorizing, or implementing any plan of reorganization pursuant to the Act; and (4) from performing any other action to enforce or effectuate the Act.

After the court below refused to grant the preliminary injunction, defendants filed preliminary objections. Before argument was heard on the objections, however, plaintiffs filed in this Court a petition for a special writ of certiorari which requested that their case be consolidated with *Chartiers Valley Joint Schools v. Alleg. County Bd. of School Directors,* a similar case already docketed on appeal in this Court.[5] We granted this petition.[6]

In the *Chartiers Valley* case, several plaintiffs filed a complaint on June 1, 1964 in the Court of Common Pleas of Allegheny County against the Allegheny County Board of School Directors and others. The complaint challenged the constitutionality of the School Reorganization Act of 1963 and sought a decree de-

---

[4] Hereafter referred to as "the Act".

[5] No. 24 March Term, 1965.

[6] This case, which will be referred to as the *Upper Merion Township* case, was docketed at No. 226 Miscellaneous Docket (Middle District).

claring that Act invalid. In the alternative, plaintiffs sought to enjoin the submission of a plan of school district reorganization which had been formulated by certain county officials pursuant to provisions of the Act. Preliminary objections to the *Chartiers Valley* complaint were sustained and the complaint was dismissed. Plaintiffs then filed an appeal in this Court.

We turn first to consideration of the appeal in the *Upper Merion Township* case.

I

As we have noted, before the case was brought here, defendants in the *Upper Merion Township* case filed preliminary objections which were not disposed of by the court below because we granted special certiorari. These objections, which must now be passed upon before reaching plaintiffs' constitutional attack on the Act, are four in number: (1) plaintiffs lack standing because of their failure to allege any present damage or injury and because the statute has not been brought into operation so as to impinge upon plaintiffs' rights; (2) plaintiffs have failed to exhaust their statutory remedies; (3) plaintiffs have failed to join as defendants the State Board of Education and the Montgomery and Luzerne County Boards of School Directors, who defendants assert are necessary and indispensable parties; and (4) plaintiffs are guilty of laches.

If none of these objections apply to any one of the plaintiffs then the merits of the case must be reached. We conclude that none of the objections prevent the taxpayer plaintiffs from raising the constitutional issue. Both the first and second objections are clearly inapplicable to the taxpayers' suit. With regard to defendants' first objection, the taxpayers have alleged the requisite financial injury to support their stand-

ing.[7] As to the second objection, defendants allege only that the school district plaintiffs have failed to exhaust their statutory remedy. In light of the pertinent statutory language, it is clear why the same objection was not asserted, and could not have been successfully asserted, against the taxpayers' suit.[8] The third objection is also inapplicable to the taxpayer plaintiffs since the purpose of their suit is to prevent the expenditure of funds under the purported authority of an unconstitutional act (compare *Mayer v. Hemphill*, 411 Pa. 1, 190 A. 2d 444 (1963)) and the proper parties to be enjoined are those who control such expenditures, i.e., the Auditor General and the State Treasurer.[9] Finally, as to the fourth objection, the allegation is simply that plaintiffs are guilty of laches because they waited until nearly nine months after passage of the Act before

---

[7] For example, Paragraph 18(a) of the complaint alleges: "Taxpayer plaintiffs, as well as all other taxpayers of the Commonwealth, will suffer irreparable loss, damage and injury in that . . . [the defendant Superintendent of Public Instruction and defendant Council] have employed, and will employ, clerks, stenographers, secretaries and other employes; have purchased, and will purchase, supplies; and have incurred, and will incur, other expenses in the administration and effectuation of the provisions of the Act, and defendants, the Auditor General and the State Treasurer, will approve requisitions for the payment of such expenses . . ."

[8] The Act provides that "any *school district* which considers itself aggrieved by a plan of organization of administrative units approved by the Council of Basic Education may appeal to the State Board of Education . . . ." (Emphasis supplied.) Public School Code of 1949, P. L. 30, §295, added by School Reorganization Act of 1963, P. L. 564, 24 P.S. §2-295 (Supp. 1964).

[9] Furthermore, there would seem to be no logical basis for requiring taxpayer plaintiffs to select as defendants two county boards from the state's sixty-seven in their suit to enjoin the expenditure of state funds. Moreover, assuming that the State Board of Education is a necessary party, service upon the Superintendent of Public Instruction in his capacity as chief executive officer of the Board would be sufficient.

bringing their suit. Defendants allege no equitable considerations in support of their contention and we conclude that the objection has no merit.

It is not necessary to decide whether any of defendants' preliminary objections would be meritorious when applied to the school district plaintiffs. Since the various preliminary objections raised by defendants must fail, at least in so far as taxpayer plaintiffs are concerned, we are compelled to turn to the constitutional issues raised by the pleadings.[10]

## II

When, as here, the constitutionality of so important a statute as the School Reorganization Act of 1963 is challenged, it is not unexpected that the attack is premised upon a number of constitutional provisions. Plaintiffs' principal contention is that the Act embodies an unlawful delegation of legislative power, thereby violating Article II, §1 of the Constitution of Pennsylvania which provides: "The Legislative power of the Commonwealth shall be vested in a General Assembly which shall consist of a Senate and a House of Representatives."

Before reaching the merits of plaintiffs' contentions on this ground, however, further elaboration is called for with regard to the operation of the Act and the effectuation of its purposes through the exercise of administrative responsibility.

Section 291[11] provides: "The State Board of Education, within ninety (90) days of the effective date of this amending Act, shall adopt standards for ap-

---

[10] The issues raised by the school district plaintiffs are identical with those raised by the taxpayer plaintiffs.

[11] Public School Code of March 10, 1949, P. L. 30, §291, added by School Reorganization Act of August 8, 1963, P. L. 564, §3, 24 P.S. §2-291 (Supp. 1964).

proval of administrative units, taking into considera-
tion the following factors: topography, pupil popula-
tion, community characteristics, transportation of pu-
pils, use of existing school buildings, existing adminis-
trative units, potential population changes and the
capability of providing a comprehensive program of edu-
cation." Plaintiffs assert that this constitutes a patently
unconstitutional delegation of legislative power to the
State Board of Education and that the "factors" which
the Legislature directs the Board to consider do not
qualify as the required statutory standards since they
are simply neutral concepts.

Section 292[12] of the Act directs that after the State
Board has drawn up its standards for reorganization,
each county board of school directors shall prepare a
plan of administrative units for the county, conform-
ing to the standards for approval of administrative
units adopted by the State Board under Section 291.

When the Department of Public Instruction deter-
mines that a plan submitted to it conforms to the
standards adopted by the State Board, Section 293[13]
directs the Department to place the plan on the agenda
of the Council of Basic Education. The Council is then
directed to review the plan and "approve such plans
as it deems wise in the best interests of the educational
system of the Commonwealth." This standard of re-
view, the plaintiffs assert, is unconstitutional in that
it is far too flexible and, as a result, is no standard at
all.

In summary, then, plaintiffs' attack on this Act
with respect to the nondelegation rule centers upon

---

[12] Public School Code of March 10, 1949, P. L. 30, §292, added
by School Reorganization Act of August 8, 1963, P. L. 564, §3, 24
P.S. §2-292 (Supp. 1964).

[13] Public School Code of March 10, 1949, P. L. 30, §293, added
by School Reorganization Act of August 8, 1963, P. L. 564, §3, 24
P.S. §2-293 (Supp. 1964).

three aspects of the Act: (1) the direction to the State Board that it formulate standards for proper reorganization, (2) the inadequacy of the "factors" which the State Board must consider in preparing its standards, and (3) the provision which directs the Council of Basic Education to "approve such plans as it deems wise in the best interests of the educational system of the Commonwealth."

The rule against nondelegation of legislative power is premised in this case on Article II, §1 of the Constitution of Pennsylvania which vests the legislative power of the Commonwealth in the General Assembly. While not specifically set forth in the Constitution, the nondelegation rule is a natural corollary to Article II, §1 since it requires that the basic policy choices involved in "legislative power" actually be made by the Legislature as constitutionally mandated.

It is generally agreed that the nondelegation principle does not require that all details of administration be precisely or separately enumerated in the statute. "While the legislature cannot delegate power to make a law, it may, where necessary, confer authority and discretion in connection with the execution of the law; it may establish primary standards and impose upon others the duty to carry out the declared legislative policy in accordance with the general provisions of the act." *Belovsky v. Redevelopment Authority,* 357 Pa. 329, 342, 54 A. 2d 277, 284 (1947); accord, *Pennsylvania Water & Power Resources Bd. v. Green Spring Co.,* 394 Pa. 1, 5, 145 A. 2d 178, 180 (1958); *Archbishop O'Hara's Appeal,* 389 Pa. 35, 47, 131 A. 2d 587, 593 (1957); *Locke's Appeal,* 72 Pa. 491, 498 (1873). However, legislation must contain adequate standards which will guide and restrain the exercise of the delegated administrative functions. *Archbishop O'Hara's Appeal,* 389 Pa. 35, 47-48, 131 A. 2d 587, 593 (1957); *Pennsylvania Water & Power Resources Bd. v. Green*

*Spring Co.,* 394 Pa. 1, 5, 145 A. 2d 178, 180 (1958); *Holgate Bros. Co. v. Bashore,* 331 Pa. 255, 200 Atl. 672, 675 (1938).

"In determining a statute's validity we must look to its purpose, its nature and its reasonable effect; we are not limited to the mere letter of the law but must look beyond the letter to determine its true purpose and effect." *Pennsylvania Water & Power Resources Bd. v. Green Spring Co.,* 394 Pa. 1, 6, 145 A. 2d 178, 181 (1958).

In light of these fundamental principles, we entertain no doubt that the School Reorganization Act of 1963 propounds sufficient standards to guide and limit the exercise of powers statutorily conferred. The legislative purpose emerges with clarity and definiteness to establish the required constitutional guidelines and standards by which the administrators who are charged with the effectuation of the Act must conduct themselves and against which the propriety and legality of their decisions can be weighed and tested.

The obvious concern of the Legislature and the purpose of the Act is summarized in Section 290 of the 1963 Act[14] which states explicitly the broad purposes of fulfilling the Legislature's constitutional responsibility to provide for a "thorough and efficient system of public schools".[15] Toward that end, Section 290 states that the Act is designed "to provide a flexible framework and effective and orderly means whereby the administrative units of the Commonwealth's public

---

[14] Public School Code of March 10, 1949, P. L. 30, §290, added by School Reorganization Act of August 8, 1963, P. L. 564, §3, 24 P.S. §2-290 (Supp. 1964).

"Although such legislative declarations are subject to judicial review they are entitled to a prima facie acceptance of their correctness: Dornan v. Philadelphia Housing Authority, 331 Pa. 209, 222, 200 A. 834, 841." *Belovsky v. Redevelopment Authority,* 357 Pa. 329, 334, 54 A. 2d 277, 280 (1947).

[15] Pa. Const. art. X, §1.

school system can be expeditiously reorganized". The need for present reorganization is reflected by the statement in the Section that "the evidence demonstrates beyond reasonable dispute that the present administrative system of more than two thousand (2,000) school districts is incapable of providing adequate education and appropriate training for all of the children of the Commonwealth above the age of six".

Significantly, after stating these purposes and policies, the Legislature explicitly provided in Section 290 that "it is further declared to be the purpose and intention of the General Assembly that the above [Section 290 titled "Purposes"] may be used in construing and arriving at legislative intent with respect to the provisions of this subdivision [on reorganization]."[16]

More specifically, in Section 293, which, inter alia, provides that the Council of Basic Education is to approve such organization plans "as it deems wise", the Act is most specific in revealing its purpose and the results which the Legislature sought to accomplish. The Section sets up two bases for approval by the Council of Basic Education, one primarily within the discretion and judgment of the Council and the other essentially mandatory if specified conditions exist. Both these bases reflect the primary legislative objective of reorganization in the direction of fewer and larger units. The "mandatory" approval requirement is only applicable under conditions explicitly barring any reduction in the size of individual administrative units or any increase in the total number of units.

---

[16] Plaintiffs' argument appears to take the position that the only possible language in the Act which might be characterized as containing standards is the list of "factors" appearing in Section 291. Such a view is unduly restrictive and fails to take into account the policy determinations and guides set forth in other sections of the Reorganization Act which apply to the Act as a whole.

The "discretionary" approval provision is even more explicit in setting forth the Legislature's norm as to the minimum appropriate size of a school district for efficient and effective education under ordinary conditions. No plan is to be approved in which any proposed school district contains "a pupil population of less than four thousand (4,000)" unless unusual, special factors require it.

To achieve the Legislature's announced objectives, the Act establishes a detailed procedure which utilizes local school officials and other experts in the field of education at various local, district, and county levels in the review and final approval of reorganization plans as well as in the initial formulation of those plans.[17] That procedure makes it clear that the legislative objective embodied in the Act is the prompt and expeditious reorganization of the Commonwealth's public school system in order to accomplish fewer and larger administrative units.[18]

---

[17] It is interesting to note that the Act grants substantial powers to county boards of school directors which are bodies of locally elected officials. The State Board is empowered to adopt and enforce standards to which plans must conform, but the actual initiative in selecting among the myriad possible combinations which meet those standards is reposed in a local elected body. Since the purpose behind the nondelegation rule is to assure that basic policy decisions are made by the people's elected representatives, much of the force of plaintiffs' objections is weakened when the delegated functions go to other elected officials over whom the people retain their control through the ballot box. Of course, this is not to say that by making such delegation, the Legislature is relieved of its constitutional duty to provide the requisite standards in the Act for its proper administration.

[18] The Final Report of the Governor's Committee on Education, Appendix Legislative Journal, p. 4574 (April 1961) proposed that the Commonwealth mandate the reorganization of school districts. At pages 4587-88, the Report explains that the purpose of such reorganization would be to increase the size of small districts which are financially unable to provide an adequate educational program:

The expression of legislative judgment in the Act as to the basic policy choices is so definite and clear that it is difficult to comprehend what else might be required. Certainly the rule against delegation of legislative power does not mean that reorganization can be achieved only by statutory specification of actual geographic boundaries for every administrative unit in the state. Short of such metes-and-bounds legislation, it

---

"The genuine progress of Pennsylvania education depends on efficient school district reorganization. Every educator of authority who testified before the Committee said this. . . .

"Here is the first and most important general fact about school district organization: the larger the school system, the more comprehensive the program. Educational Research Monograph Number 3, The Chance to Learn, closely examined the relation of curriculum offerings to school size. It demonstrates conclusively that as the size of the high school diminishes, so does the wealth of course offering. . . . Course after course—Latin, French, vocational trades and industry, fine arts, economics, Spanish and mathematics—was being offered by fewer, far fewer small high schools than large high schools.

"Why? The answer is cost. As indicated earlier, the overall cost of education per pupil is fairly uniform among districts of varying sizes. However the cost per pupil-course is not. . . . There is . . . an almost 100% increase in costs per pupil-course from the largest to the smallest systems. . . .

"A typical system of a thousand or so pupils can offer 36 courses at a cost of $10 per pupil-course, a total annual cost of about $360 per pupil. A typical system with 4,500 pupils can offer almost 50 courses with the same per pupil expenditure. . . .

"The overwhelming case for larger school districts is that they offer a richer program of education more efficiently. They offer more education for the dollar. They simply offer more education. . . .

"There can be no doubt that most of our school districts and even our joint school systems are too small to offer an adequate educational program. . . .

"The lesson is plain. There can be no true reorganization of school districts unless it is mandated by the state. The choice is simple. Either we mandate reorganization or we do not reorganize."

is difficult to see what more could be expected of the Legislature than what has been provided in the 1963 Act.

In their argument, plaintiffs place great emphasis upon the fact that the State Board is directed to "adopt standards" for approval of administrative units. Plaintiffs contend, therefore, that this is tantamount to a renunciation by the Legislature of *its* duty to put standards in the Act. This argument, however, merely manifests an artful play on the word "standard". What is clearly contemplated with standards required for a legislative delegation of duties is that the Legislature establish the norms and basic policy lines which the administrators must follow. This the Legislature did in the 1963 Act. On the other hand, when the Legislature authorizes the State Board to prepare the "standards" upon which organization plans will be approved, what is called for is simply the implementation of the legislative policy by means of an elaboration in more specific detail of the criteria set forth in the Act. We find nothing objectionable in such a delegation in this case in light of the standards and factors provided by the Legislature.

Plaintiffs' objections to the general terminology dealing with approval of plans by the Council of Basic Education also lack merit. The Council is authorized to approve organization plans "as it deems wise in the best interests of the educational system of the Commonwealth". This phrase takes on added meaning and substance when considered, as it must be, in its statutory context. Reference to the policy determinations which permeate the Act clearly limit and define the area of Council discretion in determining what is "wise in the best interest of the Commonwealth."

Our conclusion that the Act sets up sufficiently definite guidelines for the administrators to follow is reinforced when the present Act is compared with other

legislation which has been sustained over objection that the legislative guidelines were inadequate.

In *Belovsky v. Redevelopment Authority,* 357 Pa. 329, 54 A. 2d 277 (1947), the issue was whether the statutory standards under the Urban Redevelopment Law were sufficient. Under that statute administrators were to draft area development plans which designated an area as blighted and which contained recommendations for the redevelopment of that area. As this Court noted,[19] the term "blighted" was to be interpreted by the administrative unit in light of the Legislature's declaration that: " 'there exist in urban communities in this Commonwealth areas which have become blighted because of the unsafe, unsanitary, inadequate or overcrowded condition of the dwellings therein, or because of inadequate planning of the area, or excessive land coverage by the buildings thereon, or the lack of proper light and air and open space, or because of the defective design and arrangement of the buildings thereon, or faulty street or lot layout, or economically or socially undesirable land uses.' " See 357 Pa. at 333, 54 A. 2d at 279. We rejected the constitutional attack, holding that: "the act contains as definite a description of what constitutes a blighted area as it is reasonably possible to express; in regard to such factors as the selection and the size of the areas to be redeveloped, the costs involved, and the exact form which the redevelopment in any particular case is to take, it was obviously impossible for the legislature to make detailed provisions or blueprints in advance for each operation." 357 Pa. at 342, 54 A. 2d at 283. The School Reorganization Act contains guiding criteria at least as definite as those in *Belovsky.*

*Com. of Pennsylvania Water & Power Resources Bd. v. Green Spring Co.,* 394 Pa. 1, 145 A. 2d 178 (1958),

---

[19] 357 Pa. at 335, 54 A. 2d at 280.

is another helpful case. In that case the question was whether or not the authority given by the Legislature to the Water & Power Resources Board to grant or deny permits to construct dams or water obstructions was an unlawful delegation. After examining the statutory language and the circumstances surrounding passage of the statute, this Court concluded that the administrative body was sufficiently guided and limited by two factors which it was to consider: (1) whether the obstruction would potentially endanger life or property, and (2) whether the obstruction would divert the natural course of the stream or river. In holding the standards sufficient, we noted that "with thousands of streams and rivers within the Commonwealth, each presenting its particular problem, it would have been impossible for the legislature to provide a hard and fast rule to govern each situation."[20] When compared with the legislative guidance provided in the statute in the *Water & Power Resources* case, the guidance contained in the School Reorganization Act more than meets the requisite tests.

The contention of unlawful delegation was again raised in *Weaverland Independent School District Case,* 378 Pa. 449, 106 A. 2d 812 (1954). There the issue was presented in respect to the power given to the Superintendent of Public Instruction by the School Code of 1949 to approve or disapprove a petition for the establishment of an independent school district of the fourth class. In sustaining the constitutionality

---

[20] In support of our conclusion in the *Water & Power Resources* case, we cited the language of the Superior Court in *Weinstein Liquor License Case,* 159 Pa. Superior Ct. 437, 441, 48 A. 2d 1, 3 (1946) : "It was not only impractical but almost impossible for the legislature to anticipate all the various situations that might arise in [liquor] citation cases and provide therefor by specific standards or to classify them." We concluded: "The only practical approach was that which the legislature . . . adopted . . . ." 394 Pa. at 9, 145 A. 2d at 182.

of the Code we held that it could not be reasonably "argued that the standard prescribed by . . . the Code for the guidance of the Superintendent in reaching a conclusion as to the advisability of establishing an independent school district is fatally vague and uncertain." 378 Pa. at 455, 106 A. 2d at 814. By way of explaining that conclusion, this Court pointed out that: "The statute directs the Superintendent to pass upon the merits of the petition 'from an educational standpoint'. Giving those words their usual and ordinary meaning . . . they can have no other intended import than that the Superintendent must determine whether, on the basis of his expert knowledge in the field of education, the establishment of a proposed independent school district will advance or hinder the educational facilities in the designated area. It is difficult to imagine how the legislature could have more explicitly expressed its intention in the premises." 378 Pa. at 455, 106 A. 2d at 814-15. When placed beside the criteria sustained in the statute in *Weaverland* the sufficiency of the guidelines set out in the Act presently being considered seems especially clear. Compare *Fisher's Petition*, 344 Pa. 96, 23 A. 2d 878 (1942) (valid to authorize administrative body to fix "fair" wages, considering "cost of living", "reasonable value of services" and "comparable" wages, etc.) ; *Rohrer v. Milk Control Board*, 322 Pa. 257, 277-79, 186 Atl. 336, 345 (1936) ; *Dauphin Deposit Trust Co. v. Myers*, 388 Pa. 444, 451, 130 A. 2d 686, 689 (1957) (statement that "adequacy or inadequacy of banking facilities" reasonable and proper standard) ; *Tate Liquor License Case*, 196 Pa. Superior Ct. 193, 173 A. 2d 657 (1961) (authorizing administrative body to refuse license if issuance would be "detrimental to welfare, health, peace and morals of neighborhood") ; *Gima v. Hudson Coal Co.*, 106 Pa. Superior Ct. 288, 161 Atl. 903 (1932) and cases cited therein.

Still other authority is available which indicates the constitutional adequacy of the criteria laid down by the Legislature in the School Reorganization Act. In construing the Constitution of Pennsylvania on the delegation issue, we may look to similar cases construing the Constitution of the United States. *Marshall Impeachment Case,* 363 Pa. 326, 338, 69 A. 2d 619, 626 (1949); *Holgate Bros. Co. v. Bashore,* 331 Pa. 255, 259-60, 200 Atl. 672, 674 (1938). With the legislative criteria enunciated in the present case, compare, for example, that which was statutorily given and judicially sustained in the following cases: *Lichter v. United States,* 334 U.S. 742, 778-86, 68 S. Ct. 1294, 1313-17 (1948) ("excessive profits"); *American Power & Light Co. v. S.E.C.,* 329 U.S. 90, 104-06, 67 S. Ct. 133, 141-42 (1946) ("unfairly or inequitably" distributes corporate voting power); *Federal Radio Comm'n v. Nelson Bros. Bond & Mortgage Co.,* 289 U.S. 266, 285, 53 S. Ct. 627, 636 (1933) ("public convenience or necessity"); *New York Central Sec. Corp. v. United States,* 287 U.S. 12, 24-25, 53 S. Ct. 45, 48 (1932) ("public interest").

Further discussion on this issue seems unprofitable. The Legislature, after announcing its objectives, purposes and criteria, could not have been expected to further detail the guidelines and restrictions imposed on the exercise of the administrative discretion. Here, as in *Belovsky,* "The planning necessary to accomplish the purposes of the act must necessarily vary from place to place within the same city or county and from city to city and county to county. All that the legislature could do, therefore, was to prescribe general rules and reasonably definite standards, leaving to the local authorities the preparation of the plans and specifications best adapted to accomplish in each instance the desired result, a function which obviously can be performed only by administrative bodies." 357 Pa. at 342, 54 A. 2d at 283-84.

The task of considering and balancing the various criteria set forth in the Act in the light of local conditions and educational needs so that the legislative purpose may be fulfilled is a task particularly suited to the expert judgment of the local boards of directors and the various other agencies charged with the responsibilities of administering this Act.[21]

We hold, therefore, that the Act contains sufficiently definite guidelines which its administrators are well qualified to understand and apply. Plaintiffs' argument under Article II, §1 of the Constitution must fail.

## III

Plaintiffs also assert that the Act is an unconstitutional "special law" within the meaning of Article III, §7 of the Constitution of Pennsylvania[22] for the alleged reason that it adopts as the basis for classifying and distinguishing between categories of school districts an arbitrary standard of 4,000 pupils during the arbitrarily chosen school year 1961-62.

We assume for purposes of argument that plaintiffs are correct in contending that the 1963 Act involves a classification. In *Bargain City U.S.A., Inc. v. Dilworth*, 407 Pa. 129, 133, 179 A. 2d 439, 442 (1962), this Court said that "a classification in and of itself is not prohibited by Article III, §7, as we have many

---

[21] Plaintiffs' reliance on *Wilson v. Philadelphia School District*, 328 Pa. 225, 195 Atl. 90 (1937), is misplaced. The issue in that case was whether an appointive body should have the power of taxation and our holding was that such power was strictly legislative and must be exercised through elected representatives. No such taxing issue has been raised or exists in the present case.

[22] "The General Assembly shall not pass any local or special law . . . Regulating the affairs of . . . School districts: . . . changing . . . school districts: . . . Regulating the management of public schools, the building or repairing of school houses, and the raising of money for such purposes . . . ."

times held, . . . as long as the classification is reasonable and founded upon a genuine distinction. . . ."

The purpose of Article III, §7 was to "put an end to the flood of privileged legislation for particular localities and for private purposes which was common in 1873. The Section said what it meant. It was aimed at laws that were in the proper sense local and special. . . . [It] was not intended to prevent the legislature from meeting diverse needs . . . ." *Haverford Twp. v. Siegle,* 346 Pa. 1, 6, 28 A. 2d 786, 788 (1942).

The Legislature has determined that its reorganization program can be best implemented by consideration of a variety of factors, including size. We have no basis for concluding that the norm set by the Legislature—4,000 pupils per unit—is arbitrary. "Article III, §7 does not provide for a test of the wisdom of a classification but only of its good faith and reasonableness." *Bargain City U.S.A., Inc. v. Dilworth,* 407 Pa. 129, 133, 179 A. 2d 439, 442 (1962). Our sole task is to determine if the purported classification bears a reasonable and logical relationship to the end sought by the Legislature. We hold that it does.

Nor is the use of the year 1961-1962 as a base year to measure pupil population arbitrary. At the time of the enactment of the Act, statistics for 1961-1962 had been compiled and were recent enough to reflect current conditions. Moreover, the Legislature made it absolutely clear that pupil population during 1961-1962 is not a fixed determinant of school district size and that various other factors, which we have already discussed, must also be considered. In this regard, it is especially significant that the Act requires consideration of "potential population changes."[23]

---

[23] Public School Code of March 10, 1949, P. L. 30, §291, added by School Reorganization Act of August 8, 1963, P. L. 564, §3, 24 P.S. §2-291 (Supp. 1964).

## IV

Plaintiffs make the further contention that the Act violates Article III, §34 of the Constitution of Pennsylvania. That provision declares: "The Legislature shall have power to classify . . . school districts . . . according to population, and all laws passed relating to each class . . . shall be deemed general legislation within the meaning of this Constitution; but . . . school districts [shall be divided] into not more than five classes . . . ."

In support of their contention, plaintiffs cite Section 202 of the Public School Code of 1949[24] which divides school districts into five classes on the basis of population. They argue that Section 293 of the 1963 Act,[25] which prohibits the approval of a unit containing a pupil population of fewer than 4,000 (unless certain other considerations require approval), divides third class districts into two subclasses, one consisting of districts having a pupil population of fewer than 4,000, and the other more than 4,000.[26] Thus, the plaintiffs argue, this subdivision creates six classes of school districts, one more than permitted by Article III, §34. In addition, they contend that the legislation is unconstitutional because it classifies school districts on the basis of nonpopulation factors.

Even if we assume that the 1963 Act involves a classification, our holding in *Haverford Twp. v. Siegle*, 346 Pa. 1, 28 A. 2d 786 (1942), disposes of plaintiffs' contentions. In that case the constitutionality of a

---

[24] Public School Code of March 10, 1949, P. L. 30, §202, as amended by School Reorganization Act of August 8, 1963, P. L. 564, §1, 24 P.S. §2-202 (Supp. 1964).

[25] Public School Code of March 10, 1949, P. L. 30, added by School Reorganization Act of August 8, 1963, P. L. 564, §3, 24 P.S. §2-293 (Supp. 1964).

[26] Under the Code the population of third class districts ranges from 5,000 to 30,000. §202, supra note 24.

statute providing for a police civil service commission in boroughs, towns, and first class townships with three or more paid police officers was challenged as special or class legislation in violation of Article III, §§7 and 34. There the petitioners argued that Article III, §34 definitely determines the extent to which municipalities may be classified, and that it prohibits classification except by population. Expressly rejecting this contention, this Court said of §34: "The plain language of this constitutional amendment makes it clear that the legislature *may* classify municipalities according to population, and that laws for classes so provided shall be considered general for all purposes. The language is 'The Legislature shall have power to classify . . . according to population.' *There is no requirement that the legislature employ this method of classification, and no prohibition of any other method.* . . . [The section's] purpose and effect were not to contract, but to broaden, the latitude allowed in classification . . . ." (Word "may" emphasized in original; other emphasis supplied.) 346 Pa. at 8-9, 28 A. 2d at 790.

Section 34 of Article III provides a sure method for the Legislature to follow in order to avoid the pitfalls created by the special legislative provisions of §7 of Article III. Under its terms, legislation must be deemed general if school districts are divided by population into not more than five classes. However, as the *Haverford Twp.* case makes quite clear, §34 is permissive and does not purport to provide an exclusive formula for enacting legislation with respect to school districts. Surely, different legislative and administrative treatment may be accorded different districts by virtue of factors other than those contained in §34. Of course, if such legislation constitutes a classification, then its constitutional propriety under Article III, §7 must be determined.[27] But since the purpose of

---

[27] As we have determined in Part III, supra, the 1963 Act is constitutionally acceptable under §7.

§34 was to broaden the allowable latitude in classifying, it would be ironic to hold that a statute which meets the requirements of Article III, §7 must fail because it is unable to meet what plaintiffs assert are the requirements of §34 of Article III.

In fact, in the 1963 Act the Legislature did not devise additional classifications on the basis of general population. The Act does devise categories based on pupil population and other reasonable criteria, as we have noted in Part III, supra. But as plaintiffs admit—indeed, urge—in their argument in Part III, supra, classification based on pupil population is not classification by population within the constitutional sense of §34 of Article III.

Our conclusion is that the Act is not invalidated by Article III, §34.

V

We turn to consideration of the *Chartiers Valley* case in which the court below dismissed the complaint on the basis of various preliminary objections. The only constitutional question raised in that case which we have not already considered is whether the Act of 1963 impairs the obligation of contract in violation of the Constitutions of Pennsylvania and the United States.[28] Appellants contend that a jointure agreement between several school districts in 1955 made with state approval pursuant to the provisions of the School Code of 1949[29] is impaired by the formation of a new school administrative unit under the Act of 1963. We find this contention totally devoid of merit.

---

[28] U. S. Const. art. I, §10; Pa. Const. art. I, §17.

[29] Public School Code of March 10, 1949, P. L. 30, §1701, as amended, Act of July 27, 1953, P. L. 629, §12, 24 P.S. §17-1701.

We have repeatedly held that "a school district is a creature or agency of the Legislature and has only the powers that are granted by statute." *Barth v. Philadelphia School Dist.*, 393 Pa. 557, 562, 143 A. 2d 909, 911 (1958). That the Legislature reserves its power to alter the school laws is necessarily implied in contracts made by school districts. *Walsh v. Philadelphia School Dist.*, 144 Pa. Superior Ct. 321, 19 A. 2d 598, aff'd, 343 Pa. 178, 22 A. 2d 909 (1941), cert. denied, 315 U.S. 823, 62 S. Ct. 916 (1942). This is especially the case where, as here, all parties to the jointure agreement are school districts whose sole purpose is the administration of the system of public education under the direction of the Legislature. Surely, these school districts may not act in such a way as to forever bind the Commonwealth to a form of existence upon which they agree at one point of time. See *Conley v. School Directors of West Deer Township*, 32 Pa. 194 (1858). The continued ability to alter the organization of the school system throughout the Commonwealth is a prerequisite to the fulfillment of the Legislature's constitutional duty to provide for the maintenance of a thorough and efficient system of public schools.[30]

---

[30] "So implanted is this section [directing the Legislature to provide for public schools] of the Constitution in the life of the people as to make it impossible for a legislature to set up an educational policy which future legislatures cannot change. The very essence of this section is to enable successive legislatures to adopt a changing program to keep abreast of educational advances. The people have directed that the cause of public education cannot be fettered, but must evolute or retrograde with succeeding generations as the times prescribe. Therefore all matters, whether they be contracts bearing upon education, or legislative determinations of school policy or the scope of educational activity, everything directly related to the maintenance of a 'thorough and efficient system of public schools,' must at all times be subject to future legislative control. One legislature cannot bind the hands of a subsequent one; otherwise we will not have a thorough and efficient system of public schools." *Teachers' Tenure Act Cases*, 329 Pa. 213, 224-25, 197 Atl. 344, 352 (1938).

It is clear beyond doubt that statutes enacted under the Legislature's duty to provide for education in the Commonwealth and administrative acts fixing school districts pursuant to that legislation are subject to change and revision thereafter. The jointure agreement involved here was made pursuant to the authority given to school districts to enter into such agreements with the concomitant condition inherent in such legislative authority that actions taken pursuant thereto are subject to later change by the Legislature. As was pointed out in *Dodge v. Bd. of Education,* 302 U.S. 74, 79, 58 S. Ct. 98, 100 (1937), "the presumption is that such a law is not intended to create private contractual or vested rights, but merely declares a policy to be pursued until the Legislature shall ordain otherwise." Obviously, the Public School Code of 1949 did not intend to create vested rights in the administrative districts formed pursuant to its provisions but merely authorized the formation of school districts which would exist until changed or revised by future legislative direction.

In view of the nature of the Act under which the jointure agreement was made and authorized, we have no doubt that the School Reorganization Act of 1963 does not violate the constitutional prohibition against impairing the obligation of contracts.

We conclude, therefore, that the court below was correct in holding that the constitutional issues raised were without merit. Furthermore, our examination of the record persuades us that the court below was correct in holding that this action attacking the plan of reorganization as formulated by the Allegheny County School Board is premature since it is based upon speculation as to what action may in the future be taken by the Council of Basic Education and the State Board of Education, and that that complaint does not allege any immediate or present loss, damage or injury to any of the plaintiffs.

## VI

After considering all arguments in these two cases, we conclude that plaintiffs have failed in their attempts to prove the School Reorganization Act unconstitutional. Especially is this so in light of the often reaffirmed rule that " 'an Act of Assembly will not be declared unconstitutional unless it *clearly, palpably* and *plainly* violates the Constitution.' " (Italics in original.) *Milk Control Comm'n v. Battista,* 413 Pa. 652, 659, 198 A. 2d 840, 843 (1964). "Moreover, the burden rests heavily upon the party seeking to upset legislative action on constitutional grounds; all doubt is to be resolved in favor of sustaining the legislation." Ibid.

The decree of the Court of Common Pleas of Allegheny County in No. 24 March Term, 1965, *Chartiers Valley Joint Schools v. Alleg. County Bd. of School Directors,* is affirmed. The complaint filed by plaintiffs in No. 226 Miscellaneous Docket (Middle District), *Upper Merion Twp. School District v. Boehm,* is dismissed. Parties to bear own costs.

———

CONCURRING OPINION BY MR. CHIEF JUSTICE BELL:

I concur in the result solely because I consider this case unique. Legislators and draftsmen of Legislative Acts should realize that the Constitution of Pennsylvania vests all power to pass laws in the General Assembly (Article II, §1). The Legislature cannot abdicate or delegate this power because it is vested exclusively in the Legislature: *Holgate Bros. Co. v. Bashore,* 331 Pa. 255, 260, 200 A. 2d 672. See: *Bell Telephone Co. of Pa. v. Driscoll,* 343 Pa. 109, 113-114, 21 A. 2d 912.

Our prior decisions have gone the limit, indeed, I believe a number have gone beyond the limit, of recog-

nizing very general and sometimes vague language to be sufficient standards under Article II, §1.

As the majority Opinion recognizes, the Legislature may establish primary standards and impose upon others the duty to carry out the declared legislative policy in accordance with the general provisions of the Act and with the legislatively created standards. Legislation must contain adequate standards which will guide and restrain the exercise of the delegated administrative functions.

I hope this warning will be sufficient to awaken legislative draftsmen to the necessity of complying with the Constitution instead of relying solely on the worthiness of legislative objectives.

CONCURRING OPINION BY MR. JUSTICE COHEN:

I concur in the opinion of the majority but am compelled to comment upon what I consider the unwarranted appearance of the school districts in this case. In my opinion, they have no standing to attack the constitutionality of the School Reorganization Act of 1963.

"The Constitution of 1874 . . . directed the legislature to maintain 'a thorough and efficient system of public schools' . . . . The school system, or the school districts . . . are but agencies of the state legislature to administer this constitutional duty . . . . They possess only the administrative powers that are expressly granted by the central government or inferred by necessary implication . . . ." *Wilson v. Philadelphia School District,* 328 Pa. 225, 231-232, 195 Atl. 90 (1937).

"Within [the] school system, a school district is an agency of the State, created by law for the purpose of promoting education, deriving all of its powers from the statute, and discharging only such duties as are imposed upon it by statute." *Slippery Rock Area Joint*

*School System v. Franklin Township School District,*
389 Pa. 435, 442, 133 A. 2d 848 (1957).

How is it that the school district, the creature of
the Legislature, given life for the sole purpose of carry-
ing out the Legislature's duty to provide education in
the manner directed by the Legislature, can attack the
Legislature's directions for discharging its duty? Cer-
tainly the Legislature has not given the school district
*the duty* of making sure that the Legislature acts con-
stitutionally. And the school district has no powers
that are not either expressly conferred upon it by the
Legislature or implied from the nature of its duties.

Moreover, the school district is not an elector or a
taxpayer or an entity that can claim an injury arising
from unlawful delegation or discriminatory classifica-
tion or impairment of contracts. It has no constitu-
tional rights which the Legislature can impair. In
*Hughesville Borough School District v. Wolf Town-
ship School District,* 40 Pa. Superior Ct. 311 (1909),
a school district without a high school attacked the
constitutionality of the Act of March 16, 1905, P. L. 40,
which required it to pay the tuition of a resident stu-
dent who attended high school in a neighboring district.
According to the court at p. 315: "The argument seems
to be that 'the money raised by taxation for school pur-
poses is the property of the school district, that the pos-
session and disposition of the school funds belong to
the board of directors', and that, therefore, no obliga-
tion rests upon them for the payment of any money,
unless it arises under a special contract made by the
board itself." The court's correct answer to the argu-
ment was at p. 315: "A school board is exclusively the
creature of law. It has such rights, and such only, as
are conferred upon it by its creator. True it is for
some purposes a legal entity but becomes such solely
by the operation of law, and so cannot assume, as such
entity, the rights, privileges and immunities which be-

long to the individuals composing the legal entity as natural persons. 'In Pennsylvania, a school district is but an agent of the commonwealth, and as such a quasi corporation for the sole purpose of administering the commonwealth's system of public education:' . . . . It is, therefore, impossible to try the constitutionality of a law which restricts the power and authority of such a creature by a constitutional provision which has no relation to it but relates entirely to the rights, liberties, privileges and immunities of natural persons."