**Adams County School District Reorganization Appeals**

*Eugene R. Hartman, Donald M. Swope* and *Donald G. Oyler*, for appellants.

*Patrick H. Washington,* Deputy Attorney General, and *Daniel E. Teeter,* for State Board of Education.

MacPHAIL, P. J., January 24, 1970.—On March 14, 1969, the Pennsylvania State Board of Education, pursuant to the provisions of Act No. 150 of the 1968 General Assembly, Act of July 18, 1968, 24 PS §2400.1, et seq. (hereinafter referred to as "Act 150") handed down an adjudication in which it amended the Adams County plan of organization of administrative units, which called for six administrative units, by ordering two administrative units for the county. Timely appeals have been filed in this court by five of the county school districts requesting that the original plan as submitted by the Adams County Board of School Directors be reinstated. Two of the districts, McSherrystown Borough and Conewago Township, filed separate appeals requesting that they be assigned to York County. Those appeals have been considered and denied in a separate opinion of this court.

As mandated by the statute, a hearing was ordered by this court to afford the parties an opportunity to present additional testimony to the court. At the time fixed for hearing, witnesses appeared and testified

for appellants and for appellee. Following the hearing, briefs were filed by counsel and oral argument was heard.

School district reorganization in Adams County has been in the courts for some years. In 1964 the County Board of School Directors submitted a plan as mandated by the Act of August 8, 1963, P. L. 564, 24 PS §2-290, et seq. (hereinafter referred to as "Act 299"), which plan called for six units. On July 27, 1965, the State Board of Education, acting on appeals filed by aggrieved school districts, handed down an adjudication ordering, inter alia, that all the school districts in Adams County be combined into one administrative unit, exclusive of McSherrystown Borough and Conewago Township, which were assigned to York County. From that adjudication an appeal was taken by certain Adams County school districts to the Dauphin County Court sitting as the Commonwealth Court. That court held the orders of the State Board of Education to be void for procedural reasons: State Board of Education v. Franklin Township School District, 85 Dauph. 259 (1966). The decision of the Dauphin County Court was reversed on appeal to the Pennsylvania Superior Court and the case was remanded to the Dauphin County Court for disposition of the school district appeals on the merits thereof: State Board of Education v. Franklin Township School District, 209 Pa. Superior Ct. 410 (1967). At this point in time, because of the vast number of appeals pending in the Dauphin County Court and in the appellate courts, the legislature enacted Act No. 150, supra. This act was designated as a "supplement" to the Act of March 10, 1949, P. L. 30, as amended.

At the outset, a detailed analysis of Act No. 150 is necessary in order to determine the function of the court in these appeals. Such a determination may

well be crucial in reaching a conclusion with respect to the appeals pending before us. As previously noted, Act No. 150 is not an amendatory act. The title is officially reported as "No. 150, A Supplement to the Act of March 10, 1949, P.L. 30." While the Statutory Construction Act of May 28, 1937, P. L. 1019, as amended 46 PS §571, et seq., is silent concerning the interpretation of a supplemental act, there is some case law which is helpful. Thus, in Troop v. Pittsburgh, 254 Pa. 172, p. 182 (1916), it was said:

"When we speak of a supplemental act, we intend something added to, something new, and in legislation we mean by a supplement to an act already in force, to add to it something not contained in the original, which new and added legislation is nevertheless germane to the subject of that already in force."

Therefore, while it may appear at first blush that because some of the language in Act 150 is similar and even identical with that used in Act 299, which amended the Act of 1949, in fact, Act 150 does add "something new" either by way of substance or procedure or both to the Act of 1949 as amended by Act No. 299. Accordingly, it is necessary to conclude that where provisions not previously included in Act 299 are found in Act 150, they have more than usual significance in interpreting legislative intent.

Act 299 provided in the case of appeals from the decision of the State Board of Education as follows:

"The decision of the State Board of Education shall be final, unless an appeal is taken as now provided under the provisions of the Administrative Agency Law."

Under the provisions of the Administrative Agency Law of June 4, 1945, P. L. 1388, 71 PS §1710.44, the court to which an appeal was taken from an adjudication by an agency was compelled to affirm that adjudication unless appellant's constitutional rights

were violated or the adjudication was not in accord with the law or there were fatal procedural deficiencies or where findings of fact were not supported by substantial evidence. Also, appeals under the Administrative Agency Law are taken to the Dauphin County Court sitting as theCommonwealth Court.

In contrast, Act 150 makes no reference whatever to the provisions of the Administrative Agency Law. With respect to appeals from the State Board of Education, Act 150 provides that: "The court after hearing such additional testimony as the parties may wish to present and a consideration of the entire record, shall enter an order either affirming the plan as approved by the State Board of Education or an order making such amendments to the plan as the court, in its discretion, shall find necessary or advisable. The order of the court shall be a final order": Section 5, 24 PS §2400.5. Act 150 also directs that appeals from the agency adjudication shall be taken to the court of common pleas where the aggrieved school districts are located. It has been suggested that the legislature by this provision simply wanted to avoid repetition of what happened under Act 299 when a deluge of appeals fell upon the Commonwealth Court. It has also been suggested that the legislature intended that the "home" court would be in a better position than the Commonwealth Court to determine what was better for its own locale. In view of the language used by the legislature in section 5 quoted above, we think it is both logical and plausible to assume that the legislature did intend that the county courts would be in a better position to enter a final judgment on appeals taken under the statute.

Obviously, the discretion of the court is not without limitation. Even the statutory language, indicating that the order of this court shall be final, does not mean that the appellate courts will not review an

abuse of discretion. Certainly, the legislature by its language intended that these appeals be resolved on the lower court level, but our appellate courts have said, in other instances where similar statutory language has been employed, that appellate review is limited to questions of jurisdiction and the regularity of the proceedings *unless* the lower court exceeds the powers possessed by it or constitutional rights have been violated: DeVito v. Civil Service Commission, 404 Pa. 354 (1961).

An important factor the court must consider in the exercise of its discretion in this matter is the statutory language which requires that the petitions of the aggrieved school districts appealing the State Board's action must set forth that adjudication of the State Board was arbitrary, capricious and an abuse of discretion or otherwise not in accordance with the law. Under normal circumstances, the court must ascertain whether or not the allegations of petitions have been sustained and the burden of proof would be upon petitioners to sustain the specific allegations contained in the petition. If the burden of proof is not met, then this court would have no alternative but to dismiss the petitions. We shall proceed on this basis.

The adjudication of the State Board consists of four parts: a brief history, findings of fact, a two-part discussion and a conclusion. Again, in the usual course of administrative adjudications, the conclusions reached by the administrative agency must be based upon findings of fact, each of which, in turn, must be based upon substantial evidence. Since the findings of fact in the adjudications are enumerated, we shall discuss them seriatim.

Findings numbered 1 through 12 relate to matters relevant to the appeals of McSherrystown Borough and Conewago Township and, therefore, are not per-

tinent to the appeals under consideration in this opinion. Finding number 13 sets forth statistical information relating to the average daily membership of each of the six districts proposed in the county plan as related to the market value in each of those districts. This information is taken from exhibits attached to the county plan and, therefore, it is accurate.

Finding number 14 states that prior to the approval of the six-unit plan, the Adams County Board voted in favor of a two-unit plan. While the testimony before the board supports that finding, we fail to see the relevancy of the testimony or the finding of fact, since the review of the State board is limited to *the* county plan "as submitted by the county board of school directors": Section 3 of Act 150. There should be no more significance attached to a preliminary vote of the county board than should be attached to the fact that in 1964 the county board submitted a six-unit plan. Neither of these matters should have been relevant to the board's decision with respect to the appeals pending before it in 1969. Finding number 15 states that the trend in Adams County has been toward larger school systems through mergers. Again, the testimony before the board supports that finding and again this court questions the significance or even the relevance of what the "trend" is or has been in Adams County. Certainly, the fact that further mergers were *not* undertaken voluntarily is of equal significance.

Finding number 16 is very important. That finding states that the "over-riding consideration" of the county board in adopting a six-unit plan was the "resistance by local school districts to larger units." This finding is based upon the testimony of the county superintendent of schools who, throughout the hearing before the board and in the hearing before this

court, maintained strict objectivity and studied neutrality. In answer to a board member's question, the county superintendent had replied that "foremost in the thinking" of the county board members in their determination to propose a six-unit plan was "the matter of upsetting some of the communities in some way or another." Prior to expressing that opinion, however, the county superintendent had testified positively and unequivocally that the county board did consider *all* of the mandated factors "conscientiously." Furthermore, when questioned later about what he meant when he said that upsetting some of the communities was foremost in the thinking of the county board, the witness explained his previous answer by again stating that the county board considered all of the factors and that community interest was "one" of those factors. Therefore, the finding of fact does accurately reflect the testimony of the county superintendent. Moreover, other evidence in the record before the State board indicates that the county board polled the various school districts as to which of several plans would be acceptable to them and the results of that poll were anything but conclusive. Therefore, it can hardly be said that the foremost consideration of the board was fear of upsetting communities in the county. The record before the board also shows that *after* the county board announced the plan it was submitting to the State board, some districts in the county which had previously voted for a different plan notified the county board that notwithstanding their previous preference for another plan, they would support the county plan. In summary, we conclude that the testimony upon which finding number 16 was based was an opinion of a witness which was later explained to be different than as understood by the State board, that the record in other respects shows that the county board did *not*

reach its conclusions based upon the fear of upsetting some communities and that the plan proposed was based upon a conscientious consideration of all of the factors mandated by the legislature.

Finding number 17 is that a two-unit plan will not require changes in attendance areas and will promote utilization of existing buildings. The testimony of the witness upon which this finding is based simply will not support that finding. With respect to attendance areas, what the witness actually said was that in *his district* he did not contemplate any attendance area changes "whatever unit" his district went to. We assume from that, that the witness was simply stating that whether there was a six-unit or two-unit plan, there would be no change in the attendance area of Littlestown. In support of our assumption it will be noted in the record that mention was not made of a two-unit plan in the series of questions to which the witness was responding. Concerning the utilization of existing buildings, the witness said that since he understood the intent of the act to be basically for administrative services, the districts would get "as much utility and *probably* more utility from the existing building than we are getting at the present time." (Italics supplied.)

This is hardly a categorical statement from which a finding of fact could reasonably be made. More importantly, there is no statistical information or factual background to show which of the existing buildings are not being fully utilized now, nor is there any evidence of which existing buildings would be used more fully under a two-unit plan.

Finding number 18 is a deduction from finding number 13. Number 18 says that there is substantial disparity in local effort capacity. While the word "substantial" is subject to differing quantitative interpretations, it is clear from the information in find-

ing number 13 that there are at least differences in local effort capacity. However, it will be observed that the statistical evidence from which finding number 18 was drawn relates to financial capacity. While financial capacity is a very important consideration in measuring local effort capacity to resolve educational problems, it is not the only ingredient to be considered. For example, the Fairfield Area School District is certainly low in financial capacity as compared with the other proposed districts. Yet, the educational program offered at Fairfield Area School District, which was described in detail both to the board and to this court, demonstrates vividly that local effort capacity is not always directly proportionate to financial capacity. The State board members were astounded at the salary scale for new faculty members in the Fairfield Area School District. Yet, the district was paying above the State mandated minimum and more importantly the teachers were obviously producing results. It will also be observed that while the board found that there is disparity as to the economic base in the various districts included in the six-district plan, there is no corresponding finding of fact by the State board that this disparity has prevented, or will prevent, any of the six proposed districts from providing a "comprehensive program of education." Unless there is substantial evidence from which we can connect the disparity with the failure to provide or the ability to provide a comprehensive program of education, economic disparity in the several school districts loses any legal or real significance which might otherwise attach to it.

Finding number 19 is based upon testimony of three witnesses, including the Adams County Superintendent of Schools. The finding states that a six-unit plan would result in duplications in transportation.

What the witnesses really said is that in the present arrangement with 16 districts operating, there is a duplication in transportation. None of the witnesses substantiated their opinions with factual or statistical data even as to the present problems except for the county superintendent who testified that there might be "four or five" instances of transportation duplication. In a rural county such as Adams, with a great number of bus routes operating, it would seem that four or five instances of duplication would not be a substantial matter. Therefore, while the finding is technically correct, it loses its impact when viewed in proper perspective.

Finding number 20 states that there are no topographic obstacles to pupil transportation or administrative supervision in Adams County. While there is evidence in the record from which such a finding could be made, there is also evidence to the contrary.

Finding number 21 states that there is no pronounced difference in community characteristics in Adams County. This finding is supported by evidence in the record, but again there is also persuasive evidence to the contrary.

We have taken the time to review each of these findings of fact because the State board has stated in its adjudication that the county plan evidences "patent and arbitrary" disregard of substantial, pertinent facts and circumstances which show a larger unit or units to be practical. Act 150 says that the county board plan must conform with "standards of approval" to be adopted by the State Board of Education. Those standards, as adopted by the State board, provided in section 7 that each administrative unit must have an average daily membership of 4,000 *unless* upon a consideration of certain enumerated factors it is found that the plan should be otherwise.

The county plan calls for six districts, none of which met the 4,000 average daily membership requirement. Therefore, the county board plan must be examined in the light of the factors set forth in section 7 of the standards promulgated by the State board. The State board in its adjudication says the county board patently and arbitrarily disregarded those factors. The county board president, the county superintendent of schools and one member of the county school board says those factors were considered conscientiously. Therefore, the painstaking examination of the State board's findings is all the more necessary to determine if the county board did act arbitrarily. As we have indicated, the findings of fact by the State board do not support such a conclusion. Rather, it becomes apparent that it is the State board's own conclusions that are arbitrary, since they are based upon facts which are in dispute or nonexistent or irrelevant. At the very least, there is no basis for the State board's conclusion that the county board acted in patent and arbitrary disregard of the mandated factors.

Apart from the considerations already mentioned, we come to that which is most important of all. The State board, in its adjudication, stated that, "Foremost among the factors required to be considered by the county plan in formulating its plan was capacity to provide a comprehensive program of public education, the essence of the legislative goal in reorganization." With this statement we could not be more in accord. Bussing problems, administrative consolidation, school building problems, economies to be realized from bulk purchases, topography differences, community characteristics and all else should, and must, be subordinated to a consideration of one matter; which plan will best promote quality education in Adams County? It is interesting to note that although the State board says that the capability to

provide a comprehensive education is the foremost consideration, *nowhere in its adjudication does it find as a fact or conclude from facts in the record that the county plan does not have that capability!* Silence on this matter which the board itself says is crucial leads us to conclude that the board was unable to state from the record that any of the proposed districts lacked that essential capacity. In fact, in part I of the board's adjudication disposing of the appeals of McSherrystown Borough and Conewago Township, the board said, ". . . the record also discloses, according to some witnesses, quality education in Adams County . . ."

A review of the record before the board will readily indicate why the board could not find an absence of capability to provide quality education on the part of any of the six districts. Administrative officers from four of the six proposed districts in the county plan testified as to the educational program *now* being offered in their respective school systems and a board member from a fifth district explained briefly what was offered in that district. Indeed, the administrative officer from the sixth district who testified initially in opposition to the county plan found it necessary to take the stand later to explain to the State board that his district was also offering a comprehensive educational program.

When asked by a member of the State board what factors he considered to be important in a "quality education," the president of the Adams County board answered in clear and intelligent language what was involved, and he went on to explain how the factors involved applied to Adams County.

Four of the six secondary schools in Adams County at the time of the hearing before the State board were accredited by Middle States Association and a fifth is in the process of obtaining that accreditation. Each

of the secondary schools has a fine record with the success of its college students according to the testimony of administrative officials who testified, although one of the witnesses testified that there was some abnormal attrition with the graduates from the high school in his district after they were admitted to college. The State board was justly quite concerned about the Fairfield Area School District which at the time of the hearing had an average daily membership of less than 800. In spite of intensive questioning concerning current operations and future plans of that district, the board's adjudication nowhere mentions the lack of capacity of that district to provide a comprehensive educational program. We have read the record with care concerning the testimony of the school administrator from that school district, both with respect to his testimony before the State board and before this court. We are well satisfied that that district not only has the capability to provide a comprehensive educational program in the future, but is providing that type of program now.

Having thus concluded that the findings of fact of the board are in the main disputed or unsupported by substantial evidence and having also found that the board did not find as a fact that any of the proposed six districts in the county plan are incapable of providing a program of comprehensive education, we conclude that the board's adjudication amending the county plan was arbitrary and an abuse of the State board's discretion. The appeals of the several districts to this court are, therefore, sustained.

Because we have sustained the appeals without reference to the constitutionality of Act 150, we deem it unnecessary to discuss that aspect of the appeals. However, from the well-documented briefs of counsel, we observe without deciding that a serious and substantial issue has been raised which may very well be

beyond the scope of the decision in Chartiers Valley Joint Schools v. Allegheny County Board of School Directors, 418 Pa. 520 (1965). However, were we to decide this issue at this time in favor of appellants, the county school districts and the Commonwealth would be put to further expenditures of time and money while school reorganization in Adams County would remain at a standstill. We think this is neither wise nor necessary.

Since we have determined that the board's adjudication cannot be affirmed, we turn now to an exercise of our discretion in amending that plan. It has been argued to us by the several appellants and the State board that this court should not attempt to become a "super school board." With this, we concur. Therefore, we will reinstate the county plan because that plan was conceived by intelligent men who are knowledgeable in the school affairs of Adams County after a careful and conscientious consideration of the factors mandated by Act 150 and promulgated by the State Board of Education. The county plan, as proposed, utilizes present secondary attendance centers. It is based upon population concentrations in the county. It will place no undue transportation burden on any district or more importantly upon students, many of whom are already away from their homes for too long and many of whom are hard-pressed for time to have a nourishing breakfast on school days. The county plan recognizes community characteristics in each district and should involve a minimum of changes in administration. It also allows for population growth in the two areas of our county where the rate of growth is beyond normal limits. Like the county superintendent of schools, this court "places great confidence in the county board." For these reasons, a reinstatement of the county plan is both necessary and advisable.

## ORDER

And now, January 24, 1970, the appeals of New Oxford Area School District, Fairfield Area School District, Upper Adams Merged School District, Latimore Township School District and Franklin Township School District are sustained. It is ordered that the plan of the State Board of Education be amended to provide for six administrative units in Adams County as follows:

Unit 1—School District of Upper Adams (M)

Unit 2—School Districts of Bermudian Springs (M), East Berlin Borough and Latimore Township

Unit 3—School Districts of Conewago Township, McSherrystown Borough and New Oxford Area (M)

Unit 4—School Districts of Germany Township, Littlestown Borough, Mt. Joy Independent, Mt. Pleasant Township and Union Township

Unit 5—School District of Fairfield Area (M)

Unit 6—School Districts of Cumberland Township, Franklin Township and Gettysburg Area (M)