**Sanitary Water Board v.
Sunbeam Coal Corporation**

*Leo M. Stepanian, Brydon, Stepanian, O'Brien & Cook,* for appellant.

*William M. Gross,* Assistant Attorney General, for respondent.

SHELLEY, J., May 5, 1969.—This matter is before us on an appeal[1] from the adjudication of the Sanitary Water Board (hereinafter referred to as "board") disapproving the application of Sunbeam Coal Corporation[2] (hereinafter referred to as "appellant") for a permit to operate a coal mine.

The basis for the board's refusal of appellant's application to operate a coal mine was that appellant was in violation of two mine permits issued to appellant on or about May 18, 1956,[3] pursuant to the provisions of the Act of June 22, 1937, P. L. 1987, as amended by the Act of May 8, 1945, P. L. 435, 35 PS §691.313,[4] (hereinafter referred to as "Clean Streams Act").

The application for the permit which is the subject of this proceeding was received by the Sanitary Water Board on or about December 22, 1966. The board, on January 24, 1967, advised appellant that "the Board would not favorably consider applications for mine drainage permits submitted by Sunbeam Coal Corporation, unless the pollutional discharges on the Cub-

---

[1] The appeal is pursuant to section 41 of the Act of June 4, 1945, P. L. 1388, 71 PS §1710.41 (Administrative Agency Law).

[2] Docket No. 67-34 Application No. 2867BSM1 Sanitary Water Board.

[3] Permit No. 10454 was issued for what was described therein as the Cubbins Tract. Permit No. 10504 was issued for what was described therein as the McMahon Tract.

[4] The Act of 1937 (Clean Streams Act) was further amended by the Act of August 23, 1965, P. L. 372, 35 PS §691.315 p.p. This amendment is not applicable to Permits Nos. 10454 and 10504 referred to in footnote 3.

bins and McMann Tracts are abated or treated." On March 27, 1967, appellant was advised by the board that the board "on March 15, 1967, refused to approve a Mine Drainage Permit . . . because of violations against other permits issued to Sunbeam Coal Corporation," and further, that appellant could "within 15 days from the date of receipt of this letter, request the Board to hold a hearing in order that your application may be reconsidered." Appellant had no notice of the meeting of the board on March 15, 1967, and, therefore, was not in attendance.

Subsequently, a hearing on the instant application was held on November 15, 1967. At that hearing, the chief of Mine Drainage Control of Pennsylvania Department of Mines and Mineral Industries, referring to the action of the board on March 15, 1967, testified as follows:

"Q. Are you familiar with the fact, however, that the Board at its March meeting denied this permit.

"A. That is correct.

"Q. Do you know the grounds upon which this permit was denied by the Board originally?

"A. Denied?

"Q. Do you know?

"A. Yes.

"Q. What was the result?

"A. Because of existing violations listed under other permits.

"Q. And when you say 'existing violations on other permits' are you referring to the permits which I previously referred to as the Cubbins Tract and the McMahon Tract?

"A. I am."

At the November 15, 1967, hearing appellant was represented by counsel. At that hearing, the chief of Mine Drainage Control referred to above was called as a witness by the board. He testified as follows:

"Q. Have you reviewed the application which is the subject of this proceeding?

"A. I have.

"Q. And has the Department of Mines and Mineral Industries investigated that application to determine whether in the Department's opinion any pollution will result from that operation?

"A. We have made this investigation and it is our opinion that if the plan of drainage as submitted by the Applicant and the standard conditions as contained in the permit have followed, that pollution will not occur from this operation.

"Q. In other words, in your opinion, you believe that the operator will not, if he is allowed to operate on this operation, he will not have any drainage which will constitute a condition inimicable to use of the receiving stream of the purposes specified in the Act if he operates in accordance with the drainage, and in accordance with the standard conditions which you say were imposed in the permit?

"A. That is correct."

The only reasons assigned by the board for its refusal to issue a permit to appellant was that appellant had "existing violations" and had failed to correct "violations of conditions." Two hearings were held to determine if appellant was in violation of permits nos. 10454 and 10504 referred to above. The hearings were held August 17, 1966, and September 2, 1966. Approximately 300 pages of testimony were taken at the hearings. However, the board has never made any formal adjudication resulting from the hearings. The fact that the board never issued an adjudication is contrary to article I, sec. 7B, of the board's rules and regulations, which provides: "A hearing will be held for the purpose of providing the evidence upon which the Board will adjudicate a case and issue its order thereon . . . and an adjudication and order of the

Board will follow." In its brief, the board made this significant statement: "The 1966 hearing did not result in an adjudication and therefore did not, of itself, provide the basis for any action by the Board affecting appellant's rights."

It is common knowledge that when coal is mined, acid water forms. For over a century this water found its way into the streams of the Commonwealth. During this time, the State itself, particularly through its political subdivisions, was a great polluter of water, and still is. In an effort to reduce the pollution, the legislature passed the Act of 1937, supra, to preserve the purity of the waters of the Commonwealth. The Clean Streams Act was primarily directed against sewage pollution. The act was substantially amended by the Act of 1945 and again by the Act of August 23, 1965, P. L. 372. The control of acid mine water has been a problem in the Commonwealth since the inception of coal mining. The legislature, at the time it enacted the amendatory act of 1945, supra, recognized that the problem was as yet unsolved. Section 6 of the amendatory act of May 8, 1945, P. L. 435, 35 PS §691.310, provides that "Except as hereinafter provided, the provisions of this article shall not apply to acid mine drainage from coal mines until such times as, in the opinion of the Sanitary Water Board, practical means for the removal of the polluting properties of such drainage shall become known."

The Sanitary Water Board must act strictly within the authority conferred upon it by statute. When the legislature delegates authority to determine facts upon which law is to operate, it must surround such authority with definite standards, policies and limitations to which administrative officers, boards or commissions must strictly adhere and if the legislature fails to prescribe limits of power with reasonable clarity or

if limits are too broad, the statute is a nullity: Tate Liquor License Case, 196 Pa. Superior Ct. 193 (1961).

Legislation must contain adequate standards which will guide and restrain exercise of delegated administrative functions to withstand attack based on alleged delegation of legislative powers: Chartiers Valley Joint Schools v. Allegheny County Board of School Directors, 418 Pa. 520 (1965).

Permits nos. 10454 and 10504 referred to above were issued to appellant pursuant to the Act of 1937, as amended by the Act of 1945, and whatever authority the board had when it issued the two permits referred to above must be found in the Act of 1945.

The Clean Streams Act of 1937, in section 310, recognized that there were no known practical means for the removal of polluting properties produced by coal mines. It provided:

". . . the provisions of this article shall not apply to acid mine drainage from coal mines until such time as, in the opinion of the Sanitary Water Board, practical means for the removal of the polluting properties of such drainage shall become known."

Section 6 of the Amendatory Act of May 8, 1945, supra, 35 PS §691.310, added thereto:

"It shall be unlawful and a nuisance to discharge or to permit the discharge, of acid mine drainage (1) into 'clean waters' of the Commonwealth which are being devoted or put to public use at the time of such discharge; or (2) into 'clean waters' of the Commonwealth, unless the Commonwealth, after the Sanitary Water Board has approved plans of drainage pursuant to section three hundred thirteen hereof. . . ."

Section 7 of the amendatory act of 1945, 35 PS §691.313, also added to the Act of 1937 the following provision:

"Before any existing or new coal mine may be opened or reopened, and before any existing coal mine

may be continued in operation, a plan of the proposed drainage and disposal of industrial wastes, and acid mine drainage of such mine, shall be submitted to the Sanitary Water Board, and it shall be unlawful to open or reopen any such mine, or to continue the operation of any mine, or to change or alter any already approved plan of drainage and disposal of industrial wastes, and acid mine drainage from such mine, unless and until the board, after consultation with the Department of Mines has approved such plan or change of plan: Provided, however, That this section shall not apply to the continuation of the operation of an existing mine until sixty (60) days after the effective date of this act.

"Any person who shall violate any of the provisions of this section shall be guilty of a misdemeanor, and upon conviction thereof, shall be sentenced to pay a fine of not less than one hundred dollars nor more than one thousand dollars, and the person, or if such person be an association or copartnership, then the members thereof, or if such person be a corporation, then the officers, agents, servants and employes thereof, may be imprisoned in the county jail for a period of not more than one year."

The above-delegated powers concerning acid mine drainage can be succinctly divided into two categories: (1) the right to review plans of drainage for any coal mine which is to be opened, reopened, or continued in operation, and (2) the right to institute criminal proceedings against any person violating the provisions of section 313.

It is clear that the general assembly intended the board to use absolute discretion in each case where an application for a permit was requested, and to either grant or deny the application, in the case of "clean waters" not devoted to a public use, based on its determination of whether or not the drainage plans

would have a deleterious effect on the waters of the Commonwealth. Both sections 310 and 313 of the amendatory act of 1945 made it unlawful and a nuisance to open, reopen or to continue a mine in operation unless the board approved a plan of drainage for that mine. Once the board approved the plan, the "unless" was satisfied. So long as the applicant did not "change or alter" the approved drainage plans, he was deemed to be lawfully operating the mine. The obvious intendment of the law was that, if the board found that water pollution would occur, the permit was not to be granted in the first place. In the case of appellant, as is the situation with many operators that received permits between 1937 and 1966, the board issued the permit and approved the plans of drainage, but then qualified the approval with the following condition, which was attached to the permits:

"The permittee at no time shall discharge to the clean waters of the Commonwealth mine drainage FROM ANY SOURCE the acid content of which, as determined to a pH value of 8.0 by the hot phenolphthalein test, exceeds its alkaline content as determined to a pH of 4.0 by the bromphenol blue test, nor shall the water as discharged show amounts of iron which, in the opinion of the Bureau of Sanitary Engineering, are objectionable from the standpoint of the uses to which the stream is put. When the mining operations covered by this permit discharge acid mine drainage as above determined or excessive amounts of iron as above stated into the clean waters of the Commonwealth, such discharges will constitute a violation of law and render this permit subject to revocation by the Sanitary Water Board." (Condition 9 of old permits)

To issue a permit with any condition, particularly this one which attempted to make the operator an insurer of pure water in the area for all time, is an

effort by the board to avoid exercising the very discretion specifically delegated to and required of it. Of what significance was the approval of the drainage plans if in following them a coal operator can now be found to have "violated" a law? Undoubtedly, the board could "revoke" a permit if the drainage plans were found insufficient or inadequate while a mine was operating, thereby closing the mine, but it was clearly an abrogation of legislative intent for the board to assiduously word its permits so as to render their approval an invitation to commit "violations." This is exactly what the board did to all applicants. They approved that company's mining in exactly the way it mined. It was the board's power to so approve under the Clean Streams Law, but it is now trying to say that the same mining which it authorized was unlawful. This was obviously not intended under that law.

Of further significance is the fact that the Clean Streams Act specifically referred to mines being opened, reopened or continued in operation. Nowhere in the Clean Streams Act is it suggested or implied that a former operator of an abandoned mine can be held in "violation" after the mine is closed. Even in the case of Sanitary Water Board v. Sunbeam Coal Corporation, 77 Dauph. 264 (1961), wherein we held that future plans for the drainage of acid mine water after a mine closed could be required of an applicant at the time of originally applying for a permit, does not constitute authority for the proposition that an applicant can be held in "violation" of a permit after the mine is closed, when he followed the plans approved by the board.

Once the Sanitary Water Board has approved a drainage plan and the drainage plan has been followed, the responsibility of the operator ought not to

be increased after the mine has ceased any longer to be a mine.

There is nothing in the record which would suggest that appellant failed to comply with the provisions of the Clean Streams Act which were in effect at the time of the granting of the original permits. Indeed, the very adoption by the Sanitary Water Board of the term "permit" had no statutory authority until the 1965 amendment. The board's sole authority was to approve mine drainage plans after consultation with the Department of Mines and Mineral Industries. However, in every case the board has issued a permit or, more appropriately, approval of drainage plans before any mining could occur. Additionally, the backfilling of each mine must receive the approval of the Department of Mines and Mineral Industries as required in the mine drainage permit itself.

The question in this appeal is whether the board can now, when the time comes to issue a new permit, require any operator to go back and alter the once approved plans or suffer the penalty of not receiving a permit on the new operation regardless of how long the former mine has been closed. Every principle of equity and fair play dictates that such is and would be an unreasonable and wrongful imposition of an arbitrary and capricious ruling.

Next, we should consider that in most cases the preliminary determination of being in "violation" is based upon water samples taken in receiving streams which prove to contain excessive amounts of acid. But, a finding of a "violation" should not stop at this point, and strict proof of the operator's responsibility thereof ought to be required because of the quasi-penal aspect of the charge and its ultimate effect upon the business of the person charged.

If the Sanitary Water Board is going to be permitted to go back to look for "violations" of the Clean

Streams Act of 1937 as a basis for withholding a permit under the new law, it should at least be required to prove its findings in accordance with applicable legal guidelines.

The board is disregarding the criterion established by the general assembly in determining the sufficiency of any application for mine drainage permits as set forth in the 1965 amendments. It provides as follows in section 5 of the amendatory act of 1965, 35 PS §691.315, p. p.:

"(a) Before any coal mine is opened, reopened, or continued in operation, an application for a permit approving the proposed drainage and disposal of industrial wastes shall be submitted to the Sanitary Water Board. The application shall contain complete drainage plans including any restoration measures that will be taken after operations have ceased and such other information as the board by regulation shall require.

"(b) It shall be unlawful to open, reopen, or continue in operation any coal mine, or to change or alter any approved plan of drainage and disposal of industrial wastes, unless and until the board, after consultation with the Department of Mines and Mineral Industries, has issued a permit approving the plan or change of plan. A permit shall not be issued if the board shall be of the opinion that the discharge from the mine would be or become inimical or injurious to the public health, animal or aquatic life, or to the use of the water for domestic or industrial consumption or recreation. In issuing a permit the board may impose such conditions as are necessary to protect the waters of the Commonwealth. The permittee shall comply with such permit conditions and with the rules and regulations of the board."

Despite the expressed mandate of the Clean Streams Act and the amendments cited, supra, the board has

arbitrarily decided to apply as its sole criterion the determination of whether or not appellant was in "violation" of another, unrelated permit. If any applicant could be turned down solely because of being in "violation" of old permits, the board is going beyond its powers as expressed in the 1965 amendments. In the original Sunbeam case, reported in 77 Dauphin and cited supra, the question of when and how violations of other permits could be considered in connection with applications for a new permit was discussed by this court, and we concluded that:

"If an applicant has failed to carry out other plans or abide by other permit conditions, the Board may properly consider this in determining whether the plan under consideration will likely be carried out. It is a reasonable test, one which is properly available to the Board in discharging its responsibility in maintaining for the people of this Commonwealth a pure and wholesome water supply." 77 Dauph. 273.

However, the court further noted that, if an applicant is aggrieved by being held in violation of other permits, the validity of such holding should and must be contested elsewhere. The proper and only place that such matters could have been determined is in a separate hearing relating solely to the violation itself. The existence of "violation," if proven and upheld, may be admissible as some evidence of the intent of the operator in a hearing on a collateral matter. In the present situation, however, the "violations" not only had not been proven prior to the hearing, but the substance and merits thereof were the sole and only evidence introduced against the appellant in determining the sufficiency of its new unrelated application.

As we have already indicated, the chief of Mine Drainage Control testified that the drainage plan in the application was satisfactory and acceptable.

Accordingly, we make the following

ORDER

And now, May 5, 1969, judgment is entered in favor of appellant and its appeal is sustained, and the order of the Sanitary Water Board refusing to issue a permit to appellant to operate a coal mine referred to in its application for permit is reversed, and the board is directed to issue the permit.