# IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

## BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.

| | |
|---|---|
| IN RE: APPEAL FOR FORMATION OF INDEPENDENT SCHOOL DISTRICT CONSISTING OF THE BOROUGH OF HIGHSPIRE, DAUPHIN COUNTY, PENNSYLVANIA | : No. 58 MAP 2020<br>:<br>: Appeal from the Order of the<br>: Commonwealth Court at No. 242 CD<br>: 2019 dated March 2, 2020<br>: Reversing the Order of the Dauphin<br>: County Court of Common Pleas, |
| APPEAL OF: MIDDLETOWN AREA SCHOOL DISTRICT | : Civil Division, at No. 2014-CV-7500<br>: dated January 31, 2019 and<br>: Remanding<br>:<br>: ARGUED: March 9, 2021 |
| IN RE: APPEAL FOR FORMATION OF INDEPENDENT SCHOOL DISTRICT CONSISTING OF THE BOROUGH OF HIGHSPIRE, DAUPHIN COUNTY, PENNSYLVANIA | : No. 59 MAP 2020<br>:<br>: Appeal from the Order of the<br>: Commonwealth Court at No. 242 CD<br>: 2019 dated March 2, 2020<br>: Reversing the Order of the Dauphin<br>: County Court of Common Pleas, |
| APPEAL OF: STEELTON-HIGHSPIRE SCHOOL DISTRICT | : Civil Division, at No. 2014-CV-7500<br>: dated January 31, 2019 and<br>: Remanding<br>:<br>: ARGUED: March 9, 2021 |

## OPINION

**JUSTICE DONOHUE**                    **DECIDED: October 7, 2021**

In this case, a majority of the taxable inhabitants of Highspire Borough (the "Coalition") filed a petition seeking to be established as a school district independent from Steelton-Highspire School District ("SHSD") for the sole purpose of having the new school district be absorbed into the neighboring Middletown Area School District ("MASD").

According to the Public School Code, 24 P.S. §§ 1-101 – 27-2702, the Secretary of Education ("Secretary") evaluates such petitions by considering "the merits of the petition … from an educational standpoint" (hereinafter sometimes referred to as the educational merits). 24 P.S. § 2-242.1(a). Here, the Secretary issued an opinion and order denying the transfer on the grounds that the academic benefits to be enjoyed by the transferring students did not outweigh the educational detriments imposed upon the students in the SHSD and MASD districts. In particular, the Secretary concluded that the transfer would undermine the financial stability of SHSD and put a strain on class size and facilities at MASD.

On appeal, the Commonwealth Court reversed, taking issue with the Secretary's consideration of finances and holding that the Secretary should have instead narrowly focused on the academic benefits that would be enjoyed by the transferring students. *In re Petition for Formation of Indep. Sch. Dist. Consisting of Borough of Highspire*, 228 A.3d 584, 595 (Pa. Commw.), *appeal granted in part*, 239 A.3d 19 (Pa. 2020). SHSD and MASD appealed, asking this Court to reverse. We address the question of whether Section 242.1(a)'s instruction that the Secretary consider the "merits of the petition … from an educational standpoint" allows for consideration of whether the financial impacts of the transfer affect the quality of education and, relatedly, whether the Secretary may evaluate the resulting quality of education for the students in all of the school districts affected by the transfer (as opposed to just the transferring students). We conclude that in this case, the Secretary properly considered financial impacts and appropriately focused on the quality of education for the students in all of the school districts associated

with the proposed transfer. We therefore reverse the order of the Commonwealth Court and remand for further proceedings consistent with this opinion.

### Procedural Background

On April 15, 2014, the Coalition filed a petition in the Dauphin County Court of Common Pleas pursuant to Section 242.1 of the Public School Code, seeking (ultimately) for Highspire Borough to be absorbed into MASD. Findings of Fact, 2/2/2018, ¶¶ 1-2. Central to this appeal, Section 242.1 governs transfers of territory from one school district to another. It provides as follows:

§ **2-242.1. Establishment of independent districts for transfer of territory to another school district**

(a) A majority of the taxable inhabitants of any contiguous territory in any school district or school districts, as herein established, may present their petition to the court of common pleas of the county in which each contiguous territory, or a greater part thereof, is situated, asking that the territory be established as an independent district for the sole purpose of transfer to an adjacent school district contiguous thereto. Where the territory described in any such petition is to be taken from two or more school districts, such petition shall be signed by a majority of all the taxable inhabitants of the part of each school district which is to be included in such independent district for transfer. Such petitions shall set forth a proper description of the boundaries of the territory to be included in such proposed independent district, and the reasons of the petitioners for requesting such transfer to another school district and the name of the district into which its territory is proposed to be placed.

The court shall hold hearing thereon, of which hearing the school district or districts out of whose territory such proposed independent district is to be taken and the school district into which the territory is proposed to be assigned, shall each have ten days notice. **In all cases where an independent district is proposed for transfer from one school district to another, the merits of the petition for its creation, from an educational standpoint, shall be passed upon the Superintendent of Public Instruction[1] and the petition**

**shall not be granted by the court unless approved by him**. The court of common pleas shall secure the reaction from the Superintendent of Public Instruction upon receipt of the petition properly filed.

The court, in its decree establishing such independent district for transfer purposes, shall also determine the amount, if any, of the indebtedness and obligations of the school district, from whose territory such independent district is taken, that said district shall assume and pay, and, a statement prorating the State subsidies payable between or among the losing district or districts and the receiving district.

In all cases where such proceedings result in the creation and transfer, by decree of the court, of an independent district, the cost and office fees shall be paid by the petitioners or, otherwise, by the receiving district. Such independent districts created under the provisions of this act shall not become an operating school district but will be created for transfer of territory only.

(b) In the case of independent districts established hereafter, the court of common pleas shall notify the county board of school directors regarding receipt of petition for such establishment and shall direct said board to prepare a statement of acceptance or rejection of the proposed placement of the district in the designated administrative unit of the county plan; such statement to be transmitted to the court and to the State Board of Education.

[1] Now Secretary of Education; see 71 P.S. §§ 1037, 1038.

24 P.S. § 2-242.1 (emphasis added).

In its petition, the Coalition set forth various reasons for seeking transfer, emphasizing that it would be in the best educational interest of present and future school-age children in Highspire. Petition, 8/25/2014, ¶ 8.a. Specifically, the Coalition asserted, inter alia, the following:

- SHSD had routinely failed to achieve progress as assessed by the Department of Education (the "Department"), whereas [MASD] had regularly achieved said progress,

- SHSD students typically underperform on Pennsylvania School assessment tests and SAT exams, while [MASD] students outperform their peers throughout the Commonwealth.

- MASD offers a more diverse array of extracurricular activities.

- Due to severe budget constraints, in recent years, [SHSD] has reduced teacher staffing and education programs.

- Significant noncompliance by [SHSD] with relevant requirements as found by the Pennsylvania Auditor General in its February 2014 Performance Audit Report, including:

  o Possible teacher certification deficiencies;

  o School bus driver qualification deficiencies; and

  o Serious financial challenges, including a $2,680,400 general fund deficit that prompted the Auditor General to state: "If the District's financial situation continues to deteriorate, it is possible that the Pennsylvania Department of Education may declare it to be in financial recovery status."

*Id.* ¶ 8.

Both SHSD and MASD (collectively, the "Districts") opposed the petition, filing responses denying the allegations in the petition and asserting generally that it was legally insufficient. SHSD Response in Opposition to Petition, 9/8/2014, ¶¶ 4, 6; MASD Response in Opposition to Petition, 9/23/2014, ¶ 4.

The trial court determined that the petition complied with the preliminary requirements of section 242.1 of the Public School Code and forwarded it to the

Department for a determination of the educational merits of the petition for the independent district's creation. Trial Court Order, 10/15/2014, at 1-2. This task was assigned to Deputy Secretary Matthew Stem for a pre-adjudication determination. *Id.*

In rendering his determination, Deputy Secretary Stem collected educational impact projection questionnaires from SHSD and MASD. Findings of Fact, 2/2/2018, ¶¶ 3-6. Both SHSD and MASD advanced reasons for opposing the transfer. MASD "strongly believe[d]" that the transfer "would adversely impact its student class size, special education service delivery model, and overall academic achievement, particularly at the elementary level." MASD Questionnaire, 2/13/2015, at 27. MASD expressed concern that the proposed transfer "would strain existing facilities, staff and programs[,]" that some of the district's programs "would need to be curtailed or eliminated so resources could be reallocated to meet the basic needs of the[] new students[,]" and that the "scenario would not benefit existing [MASD] students[.]" *Id.* at 60. SHSD also opposed the transfer, stating that it would negatively impact the quality of educational programming for remaining SHSD students. SHSD Questionnaire, 2/17/2015, at 1, 37. Identifying itself as a district in financial distress, SHSD emphasized how the financial ramifications of the transfer would negatively impact the quality of education for the remaining SHSD students. *Id* at 13. For instance, in the event of a transfer "approximately 8 teachers will need to be furloughed." *Id.* at 25. Further, whereas SHSD at the time enjoyed normal class sizes, "class sizes would likely have to go beyond [thirty students] per class in order to create a balanced budget." *Id.* SHSD acknowledged that it was "already struggling financially with all resources, including educational[,]" and complained that the "transfer

would further limit the district" and greatly diminish educational opportunities. *Id.* at 14, 26.

Over the Coalition's objections, Deputy Secretary Stem collected additional information regarding the Districts from site visits. Findings of Fact, 2/2/2018, ¶¶ 7-25. Finally, he reviewed a "financial audit and a classroom audit[,]" commissioned by the Department and performed by PFM Group LLC, which was completed on July 18, 2017. *Id.* ¶¶ 26-30.

The PFM Group Report (the "PFM Report") addressed the educational impact of the proposed transfer given the instructional and financial changes in a new MASD (with Highspire students) and a new SHSD (without Highspire students). PFM Report, 7/18/2017, at 41. It determined that the loss of the Highspire students and local tax base would "have a negative impact on the financial flexibility of [SHSD] and as a result its ability to invest in programs and services for the remaining students." *Id.* at 48. In other words, the Report concluded that "there would be a negative educational impact on remaining [SHSD] students as a result of the split." *Id.*

In his pre-adjudication determination, Deputy Secretary Stem set forth numerous findings of fact, including the following:

- MASD has higher academic achievement than SHSD, as measured by standardized tests and value added assessment tools used to evaluate student growth. Findings of Fact, 2/2/2018, ¶¶ 150-161.

- MASD enjoys better attendance, truancy, drop-out and graduation rates than SHSD. *Id.* ¶¶ 76-81.

- Should a transfer occur, SHSD would incur great costs, namely, the loss of $1.6 million/year in tax revenue, $2 million/year in subsidies, and a weakened ability to provide for students. *Id.* ¶¶ 241-256.

- SHSD's continued financial challenges would be exacerbated by a transfer. *Id.* ¶ 257.

- MASD and SHSD offer a comparable range of academic courses and they both offer programs accommodating students of varying abilities and interests. *Id.* ¶¶ 124-149. Both districts support parental involvement and have infrastructure to support students. *Id.* ¶¶ 190-216.

- MASD cited genuine concerns about class sizes and strains on facilities that would occur with a transfer. *Id.* ¶¶ 89-95.

Deputy Secretary Stem observed that the review of the merits of the petition from an educational standpoint included both academic achievements and other considerations, such as distance of travel for affected students and financial concerns. Pre-adjudication Determination, 2/2/2018, at 73. He acknowledged that these considerations must be tethered to the "relevant provisions in the Public School Code[.]" *Id.* at 69 (citing *In re: Petition for Formation of Indep. Sch. Dist.,* 17 A.3d 977, 988-89 (Pa. Commw. 2011) ("*Riegelsville II*") (citing *In re Weaverland Indep. Sch. Dist.*, 106 A.2d 812, 815 (Pa. 1954)). In that respect, he denied the Coalition's request to consider only the academic programs and extracurricular programs that were raised in the petition as unreasonable. *Id.* at 71-72. Instead, he considered a number of factors emphasized in the Public School Code, including the expected financial impacts of the proposed transfer. In that respect, he noted that SHSD is in "financial watch status" pursuant to the Public School Code, 24 P.S. § 6-611A.[1] *Id.* at 72-73. Deputy Secretary Stem concluded his

---

[1] The Department identifies a district as being in "financial watch status" based on an analysis of various fiscal and socioeconomic factors. 22 Pa. Code § 731.1-731.2. Once a district is in "financial watch status," the Department can request all information needed to review fully a district's financial situation, and, based on its review, provide the district with technical assistance. 24 P.S. § 6-611-A(b).

pre-adjudication determination by indicating that "any educational benefits received by Highspire students would be vastly outweighed by the negative educational impact of the proposed transfer borne by the remaining Steelton students and that also may be borne by the students in the expanded MASD." *Id.* at 120.

At an administrative hearing held pursuant to 1 Pa. Code § 35.20,[2] the parties proceeded on the basis of stipulations and without any objections. N.T., 6/11/2018, at 4-6. The parties stipulated to the multitude of records identified in the pre-adjudication determination, Stipulation of Facts, 6/4/2018, ¶¶ 11.1–11.51, with a qualification that the Coalition reserved any objections it had to, inter alia, any of the findings of fact in the [pre-adjudication determination] based thereon or in the PFM Report. *Id.* ¶ 12. Critically, the Coalition did not assert any objections to the findings of fact or the PFM Report.

Following briefing, the Secretary issued an opinion and order concluding that the petition was not meritorious. Like the Deputy Secretary, the Secretary rejected the Coalition's objections to the consideration of financial matters associated with the "substantive provisions of the School Code." Secretary's Op. and Order, 1/16/2019, at 21 (citing *Riegelsville II*, 17 A.3d at 991). He observed that the educational merits of a petition have been interpreted to include various considerations, and that, relevant to this case, the School Code "is replete with specific provisions … reflect[ing] the legislature's policy choices concerning the importance of school district finances to education." *Id.* at 25-27. "The legislature placed these provisions in the School Code in clear recognition

---

[2] As provided in Section 35.20 of the Pennsylvania Administrative Code, "[a]ctions taken by a subordinate officer under authority delegated by the agency head may be appealed to the agency head by filing a petition within 10 days after service of notice of the action." 1 Pa. Code § 35.20.

that a school district's financial health is an important factor in ensuring that the school district provides an adequate education to its students." *Id.* at 28. The Secretary further observed that traditionally an examination of the educational merits of a proposed transfer includes consideration of the anticipated educational impacts on the students within the territory proposed for transfer, those remaining in the district losing those students, and in the district gaining those students. *Id.* at 23 (citing *Washington Twp. Indep. Sch. Dist. v. Pa. State Bd. of Educ.*, 153 A.3d 1177, 1181 (Pa. Commw. 2017)).[3]

Turning to the educational merits of the Coalition's petition, the Secretary "concur[red] with the Deputy Secretary's analysis … and adopt[ed] his detailed analysis as a whole." *Id.* at 33. In so doing, the Secretary acknowledged that the most significant factors in favor of the Petition are that it would permit the Highspire students to join a school district with a better history of academic results. *Id.* Critically, however, "the transfer would come at a great educational cost to the remaining students" in SHSD. *Id.* at 34. "Most notably, the grant of the Petition would transfer a large portion of [SHSD]'s local tax base amounting to approximately $1.6 million per year." *Id.* This loss of revenue would "weaken [SHSD]'s ability to provide services to students." *Id.* He continued that this transfer "would punch a material hole in [SHSD]'s budget on account of a loss of revenue[,]" and that SHSD would have to "cut[] educational programs to the students that remain." *Id.* at 35. The Secretary concluded that the petition would offend the educational policy choices of the Public School Code "by leaving the remainder of the [SHSD]

---

[3] Notably, the Secretary relied on stipulated-to findings of fact from the pre-adjudication determination in analyzing the educational merits of the petition. In that respect, he rejected the Coalition's procedural objections – raised after the administrative hearing – to the Deputy Secretary's consideration of the PFM Report's financial analysis. *Id.* at 29.

financially undermined." *Id.* at 36. For educational policy reasons, the General Assembly "clearly intended to foster the creation of financially stable school districts[.]" *Id.* The Secretary therefore stated that he could not approve the petition. *Id.*

The Coalition appealed to the Commonwealth Court, challenging the Secretary's consideration of finances in reaching his educational merits determination. The Commonwealth Court reversed the Secretary's decision, finding two aspects of his determination to be deficient. *Borough of Highspire,* 228 A.3d at 584. It acknowledged that the educational merits of a petition must be given its ordinary meaning, "guided by the policy choices made by the legislature in the [Public School Code]." *Id.* at 590-91 (citing *Washington Twp.*, 153 A.3d 1177, 1184 (Pa. Commw. 2017) (citing *Riegelsville II*, 17 A.3d at 991)). The court also emphasized that in the statutory scheme relating to transfer petitions, first the Secretary evaluates the educational merits of a petition, and then the trial court conducts "apportionment of the state education subsidy and the school debt." *Id.* at 592. Thereafter, the court explained, "[t]he State Board does the final review[,]" according to its statutory standards. *Id.* at 592-593.

Turning to the question at hand, the court recounted Webster's Dictionary definition of education in terms of "knowledge, skill, competence, or desirable qualities of behavior or character or of being so provided esp. by a formal course of study, instruction, or training[.]" *Id.* at 593 (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 723 (2002)). The court explained that this definition is consistent with this Court's statement in *Weaverland* that the essence of educational merit is "school considerations." *Id.* (citing *Weaverland*, 106 A.3d at 814).

Against this background, the Commonwealth Court criticized the Secretary's rejection of the transfer based upon his focus on financial, rather than educational, grounds. Although the court acknowledged that the consideration of educational merits of a petition might be broader than consideration of academics, it disagreed that "educational" is broad enough to encompass "financial," and rejected the Secretary's conclusion in this respect. *Id.* at 594.[4] The court further reasoned that it was for the trial court to determine the indebtedness and obligations of the school districts and submit the information to the State Board. *Id.* at 595 (citing 24 P.S. § 2-242.1(a)).

Additionally, the court criticized the Secretary's approach as creating an absurd result both specifically in this case and generally for students in districts in "financial watch status." *Id.* at 593. The Secretary's decision to reject the present petition "effectively nullifies the possibility of any transfer of students from a school district in financial peril unless agreed to by that district." *Id.* With respect to the Coalition's petition, the court stated that adjudication created a "financial paradox" because SHSD is "'projected to continue to experience a persistent structural deficit with or without the transfer.'" *Id.* at 594 (citing Secretary's Op. and Order, 1/16/2019, at 17). "Stated otherwise, the educational opportunity denied Highspire students will not solve [SHSD's] financial challenges." *Id.*

The Commonwealth Court thus ruled that the Secretary's focus must be limited to the "educational merit for Highspire students" without regard to the financial implications

---

[4] The court further disapproved of the Secretary's consideration of finances because there were "no specific findings to support those presumptions." *Id.* at 594. In this respect, the court overlooked the parties' agreement to proceed on the basis of stipulations – stipulating to the Deputy Secretary's findings of fact and the contents of the PFM Report. Stipulation of Facts, 6/4/2018, ¶¶ 11.1–11.51, 16; N.T., 6/11/2018, at 4-6.

of the transfer on the quality of education for the students at SHSD or MASD. *Id.* at 594-95. The court stated that the "Secretary erred in finding the educational merits of the transfer to be outweighed by PFM's adverse financial projections, which are conjectural and beyond the scope of the Secretary's 'educational merits' review[.]" *Id.* at 595. The court therefore reversed the order of the trial court and remanded for that court to enter a decree establishing an independent school district. *Id.*

The Districts appealed. This Court granted review to address the following issue presented by MASD:

> (1) Whether the Commonwealth Court erred in failing to follow its own precedent, as well as Supreme Court precedent, in holding the Secretary of Education could not consider the devastating financial impact a proposed transfer of territory between two school districts would impose upon an already financially-distressed school district?

*In re Petition for Formation of Indep. Sch. Dist. Consisting of Borough of Highspire*, 239 A.3d 19, 20 (Pa. 2020). We also granted review of three issues presented by SHSD:

> (1) Whether the Commonwealth Court's reversal of the Secretary of Education's determination that the Petition to create an Independent School District was not meritorious from an educational standpoint was in err when it departed from its own recent precedent?
>
> (2) Whether the Secretary of Education's consideration of the financial impact of the proposed transfer on a school district that has been identified as financially at risk and placed on 'Financial Watch Status' is an issue of first impression and accordingly should be reviewed by this Court.
>
> (3) Whether the catastrophic financial impact on a financially at risk school districts' ongoing ability to provide adequate educational services to its current and future students is of substantial importance to the students and their families that will remain in the District.

*Id.*

**Arguments of the Parties**

The Districts emphasize that the educational merits of a proposed transfer are not limited to academic achievement alone, but instead are tied to the Public School Code substantive policy provisions. MASD's Brief at 14; SHSD's Brief at 20. They reiterate the Secretary's sentiment that the Public School Code is replete with specific provisions reflecting the General Assembly's policy choices regarding the importance of finances to education. MASD's Brief at 15; SHSD's Brief at 25. This is sensible, the Districts explain, because a school district's financial health is inextricably linked to its ability to provide quality educational programming. MASD's Brief at 16-17; SHSD's Brief at 25. The Districts also assert that it is incumbent upon the Secretary alone "to assess whether financial considerations are sufficiently material to impact the educational merits of a transfer petition." MASD's Brief at 26; SHSD's Brief at 31-32. The Districts criticize the Commonwealth Court for conflating the role of the Secretary with that of the Court of Common Pleas. MASD's Brief at 25 (citing § 2-242.1(a)); SHSD's Brief at 31-32; SHSD's Reply Brief at unnumbered pages 8-10. They emphasize that a trial court's authority extends only to the apportionment of debt, obligations and subsidies. It does not include authority to apportion tax revenues. *Id.* The trial court also lacks the authority or expertise to analyze and "ensure that each of the affected school districts has the necessary financial resources going forward to educate the children they must serve." MASD's Brief at 25.

The Districts criticize the Commonwealth Court and the Coalition for taking a myopic view of whether those seeking the transfer would benefit without regard to the impact of the transfer on other students. MASD's Brief at 19-20; SHSD's Brief at 20, 35.

The Districts focus on *Weaverland*'s guidance that an educational merits analysis must be informed by the Secretary's determination of whether the establishment of an independent school district will advance or hinder the educational facilities in the designated area. MASD's Brief at 19-20 (citing *Weaverland*, 106 A.2d at 814-15); SHSD's Brief at 17-19. They assert that the "designated area" necessarily includes all students impacted by the transfer, including those in the district from which transfer is sought (students remaining in SHSD) and those in the district to which transfer is sought (students already in MASD). MASD's Brief at 20-22; SHSD's Brief at 19-20.

Additionally, MASD asserts that a Section 242.1 educational merits review is a flexible, individualized assessment based on the expert opinion of the Secretary. It compares the role of the Secretary in assessing transfer petitions with the role of the Council of Basic Education to evaluate school district reorganization plans under the School District Reorganization Act of 1963. *Id.* at 27 (citing *Chartiers Valley Joint Schs. v. Cty. Bd. of Sch. Dirs. of Allegheny Cty.*, 211 A.2d 487 (Pa. 1965)). In *Chartiers Valley*, this Court addressed the constitutionality of the General Assembly's reorganization of school districts within the Commonwealth pursuant to 24 P.S. § 2-293. *Chartiers Valley*, 211 A.2d at 495. In finding the legislation constitutional, we explained that the General Assembly "could not have been expected to further detail the guidelines and restrictions imposed on the exercise of administrative discretion." *Id.* at 497. In recognition that school district "planning necessary to accomplish the purposes of the act must necessarily vary from place to place within the same city or county and from city to city and county to county[,]" the Court explained that the legislation could only "prescribe general rules and reasonable definite standards" and then leave it to local authorities to

establish plans adapted to each place. *Id.* at 497 (internal citations omitted). MASD maintains that the logic of *Chartiers Valley* applies with equal weight to the present circumstance, since the Secretary's assessment (like that of the Council of Basic Education challenged in *Chartiers Valley*) must be made "in light of local conditions and educational needs[.]" MASD's Brief at 28-29 (citing *Chartiers Valley*, 211 A.2d at 497). MASD concludes by stating the following:

> The Secretary's Opinion stayed with the educational policy parameters outlined in *Riegelsville II*, and reflected the balancing of all parties' interests as contemplated by *Weaverland*. Accordingly, while the Commonwealth Court may have reached a different educational merits determination than the Secretary, this Honorable Court's decision in *Weaverland* and *Chartiers Valley* dictate that the Secretary's decision should be reinstated.

*Id.* at 29.

The Coalition responds that the Commonwealth Court properly reversed the Secretary's determination because the Secretary went outside of the proper bounds of a Section 242.1 review of the educational merits of a petition. Coalition's Brief at 12-13. The Coalition maintains that the Secretary should have looked to the "advancement of the public education of the students involved in the transfer[,]" not costs, money and loss of revenue to the school district from which the students seek transfer. *Id.* at 13-14 (citing *Weaverland*, 106 A.3d at 814). The Coalition asserts that the Secretary wrongly made findings regarding money, loss of revenue and the costs of the transfer, noting that Section 242.1(a) provides that the apportionment of tax and state aid revenues between the sending and receiving district "is a matter to be worked out by the trial court **after** a finding of educational merit by the Secretary." *Id.* at 14 (emphasis in original). In further support, the Coalition recites a portion of *Riegelsville II* in which the Commonwealth Court

"criticized the Secretary for addressing the petition 'strictly in terms of its potential financial consequences.'" *Id.* at 15 (citing *Riegelsville II*, 17 A.3d at 985).

The Coalition argues in the alternative that even if financial considerations are relevant, financial watch status is an "insufficient basis" for an educational merits determination because 24 P.S. § 6-611 does not include any procedure for challenging the designation.[5] *Id.* at 19-20. The Coalition asserts that allowing consideration of the designation would create an absurd result, namely that the designation would be an inescapable impediment to transfer to any district so designated. *Id.*

In their reply briefs, the Districts take issue with the Coalition's reliance on *Weaverland* and *Riegelsville II*, contending that the Coalition interprets these cases too broadly. With respect to *Weaverland*'s reference to "school considerations," the Districts complain that it is read out of context, and that the relevant language of *Weaverland* gives guidance that the Secretary's decision should be informed by the usual and ordinary meaning of educational merits – not merely school considerations. *See, e.g.*, MASD's Reply Brief at 1-3 (citing *Weaverland*, 106 A.2d at 814-15). The Districts assert that the Coalition misreads *Riegelsville II* as prohibiting the Secretary from considering finances, as the court there actually criticized the school districts' **singular** focus on financial consequences of a transfer without offering a coherent interpretation of the educational merits. MASD's Reply Brief at 4-5 (citing *Riegelsville II*, 17 A.3d at 985); SHSD's Reply Brief at 1-2. The Districts point out that the court in *Riegelsville II* was criticizing the school districts' approach but did not state or purport to prohibit any consideration of non-academic criteria for educational merits. For instance, the court in *Riegelsville II*

---

[5] In 2017, the General Assembly adopted 24 P.S. § 6-695-A(i), which provides a process for removal of the "financial watch status" designation when a school district demonstrates its ability to maintain a structurally balanced budget. *Id.* § 6-695-A(i).

recognized non-academic criteria such as eliminating discontinuous school boundaries and length of commute for students.[6]

**Analysis**

In this appeal, we address the scope of the Secretary's evaluation of "the merits of the petition … from an educational standpoint" pursuant to Section 2-242.1. In particular, we must determine whether the Commonwealth Court erred in ruling that the Secretary may not consider the financial implications of the transfer upon the quality of education provided in the affected school districts. The Commonwealth Court ruled that the Secretary's evaluation of the educational merits of the Coalition's petition should have focused narrowly on the academic benefits that would have been enjoyed by the transferring Highspire students.

Section 2-242.1 of the Public School Code ("Section 242.1") provides a means for a majority of the taxable inhabitants within a geographical territory to file a petition to create an independent school district for the purpose of transferring that territory to another school district that is territorially contiguous with that of the petitioning district. 24 P.S. § 2-242.1. The petition must initially be filed with the court of common pleas, which determines if the petition meets certain basic procedural requirements, e.g., that a majority of the taxable inhabitants of the would-be independent district have signed the petition and that the proposed receiving district is contiguous to that territory. *See In re*

---

[6] Two Amici submitted briefs, both in support of the Secretary's rejection of the Coalition's petition. *See* Brief of Amicus Pennsylvania State Education Association ("PSEA") at 6-7 (stating that the General Assembly "gave ultimate oversight" of the school reorganization process provided in the Public School Code to the Secretary of Education precisely because of his "expertise in the field of education[.]"); Brief of Amicus Pennsylvania School Board's Association at 17-18 (expressing concern with the Commonwealth Court's attempts to narrow the scope of the Secretary's educational merits review).

*Establishment of Indep. Dist. of Wheatland*, 846 A.2d 771 (Pa. Commw. 2004). The court of common pleas then sends the petition to the Secretary, who then must pass on "the merits of the petition for its creation, from an educational standpoint." 24 P.S. § 2-242.1.

If the Secretary approves the petition, it is returned to the trial court to sign a decree establishing the independent school district, along with a statement of the obligations of the school district from which the independent school district is being severed and a statement prorating the state subsidies payable between or among the former school district and the new school district. *Wheatland,* 846 A.2d at 773. The matter is then transferred to the State Board under Section 292.1 of the School Code, *Washington Township*, 153 A.3d 1187, to determine whether the transfer would "violate the adopted Board standards or express statutory standards that govern the organization of school districts." *Riegelsville II*, 17 A.3d at 981-82. If the State Board approves, then the independent district is merged into the new and reconstituted school district. *Id.*

To determine the scope of the Secretary's educational merits analysis, we look first to our decision in *In re Weaverland Independent School District*, 106 A.2d 812 (Pa. 1954), in which we addressed a now repealed section of the Public School Code[7] with nearly identical language to the current Section 242.1. In *Weaverland*, we addressed two discrete issues: (1) whether the Superintendent of Public Instruction was unlawfully delegated with the legislative power to grant a petition to transfer territory between two school districts, and (2) whether the Superintendent's statutorily-defined role to review

---

[7] The now repealed provision, 24 P.S. § 2-242 (repealed 1966), contained language substantially similar to its current counterpart, Section 2-242.1. Although at the time it retained the language charging the "Superintendent of Public Instruction" with the assessment of educational merits, the assessment is now performed by the Secretary of Education in accordance with 71 P.S. § 1038.

the educational merits of such transfer petition was unconstitutionally vague. *Id.* at 814-15.

With respect to the first issue, we compared the decision-making process under then Section 2-242 with that of a decision involving an attempt to annex a part of a township to a contiguous city, which we decided was not an unconstitutional delegation of legislative authority. *Id.* at 814 (citing *In re Baldwin Twp's Annexation*, 158 A. 272 (Pa. 1931)). The statute at issue in *Baldwin Township* required approval by the State Council of Education of a proposed annexation of the township to Pittsburgh, a contiguous city. The decision of the State Council of Education was to be made after inquiry on the effect of the annexation on the affected school districts. *Baldwin Twp.*, 158 A. 273-74. In making the comparison to *Baldwin Township*, we observed that the challenged authority conferred under the annexation statute was greater than that conferred by then Section 2-242, which involved only "school considerations" whereas the issue in *Baldwin Township* related to municipal annexations.[8] *Id.*

In the present case, the Commonwealth Court took out of context our reference in *Weaverland* to "school considerations" in order to buttress a severe limitation on the scope of the Secretary's determination of the educational merits of a proposed transfer under Section 2-242.1. Indicating that WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY defines "education" to include four discrete definitions, namely "course of study," "learning," "instruction," and "training," the court stated as follows:

---

[8] In making that comparison, the *Baldwin Township* court drew on the dissenting opinion of Chief Justice Frazer, in which he viewed the State Council of Education's authority as limited to school affairs. *Baldwin Twp.*, 158 A. at 274 (Frazer, C.J., dissenting). Consequently, it did not extend to the power to veto an annexation. *Id.*

Here, the Secretary based his decision upon [SHSD]'s financial condition. This is beyond the "school considerations" that the Supreme Court held to be the essence of educational merits in *Weaverland*, 106 A.2d at 814. Nor does a school district's financial condition meet the ordinary understanding of "educational," which focuses on instruction, course of study and learning.

*Borough of Highspire, 228 A.3d at 593* (footnote omitted).

The Commonwealth Court's efforts to exclude any consideration of financial conditions were erroneous in at least two basic respects. First, in *Weaverland* this Court did **not** hold that our generic reference to "school considerations" constituted the "essence of educational merit." *Id.* at 593 (citing to *Weaverland*, 106 A.2d at 814). To the contrary, the Court provided an express statement describing the analysis of the educational merit of a petition. Specifically, we stated:

The statute directs the Superintendent to pass upon the merits of the petition 'from an educational standpoint.' Giving those words their usual and ordinary meaning, … they can have no other intended import than that **the Superintendent must determine whether, on the basis of his expert knowledge in the field of education, the establishment of a proposed independent school district will advance or hinder the educational facilities in the designated area.**

*Weaverland*, 106 A.2d at 814-15 (emphasis added). As such, in construing the phrase "merits…from an educational standpoint," we indicated that it should be given its "usual and ordinary meaning," which in turn requires the Secretary to use his or her "expert knowledge in the field of education" to decide whether a transfer petition "will advance or hinder" education "in the designated area." *Id.* We further added that in this respect, in the analogous situation, the General Assembly "could [not] have more explicitly expressed its intention[.]" *Id.* at 815.

Second, in holding that a school district's financial condition does not "meet the ordinary understanding of 'educational,'" the Commonwealth Court contradicted its own precedent. In *Riegelsville II*, the Commonwealth Court concluded that the Section 2-242.1 petition at issue in that case had educational merit because: (1) the transfer at issue would end certain discontinuous school district boundaries that "offended" the School Code; (2) the transfer would place all of Riegelsville Borough into one school district; and (3) the transfer would eliminate a long school commute for school children and place them in a school district that potentially produced better academic results.[9] *Riegelsville II*, 17 A.3d at 991. As such, the Commonwealth Court in *Riegelsville II* eschewed any notion that the scope of an educational merits analysis under Section 2-242.1 is limited to the dictionary definition of the word "education," i.e., referring to "course of study," "learning," "instruction" and "training." The primary factors supporting a finding of educational merits in *Riegelsville II*, specifically fixing school district boundaries, placing a municipality into one school district and shortening school bus rides had nothing whatsoever to do with students' course of study, learning, instruction or training.

Moreover, contrary to the Commonwealth Court's position in the present case, it did not hold in *Riegelsville II* that financial considerations could not be used in an analysis of educational merit. While the court in *Riegelsville II* criticized the **parties** for failing to offer a "coherent interpretation of the phrase 'from an educational standpoint'" because

---

[9] In the initial appeal, *In re: Petition for Formation of Independent School District*, 962 A.2d 24, 28 (Pa. Commw. 2008) (*Riegelsville I*), the Commonwealth Court awarded the Riegelsville Tax and Education Coalition ("Riegelsville Coalition") a new adjudication of its petition, determining that the original adjudication violated due process. *Riegelsville I*, 962 A.2d at 28. The later appeal, *Riegelsville II*, addressed the Secretary's determination that the Riegelsville Coalition's petition lacked educational merit.

they analyzed the matter "**strictly** in terms of its potential financial consequences," 17 A.3d at 985 (emphasis added), the court plainly did not in any respect rule out the possibility that financial consequences could be considered.

The appropriate parameters for the Secretary's analysis of the educational merits of a proposed independent school district is an issue of first impression. In Section 2-242.1(a), the General Assembly delegated the determination of a proposed independent school district to the Secretary, which it can do without violating the Constitution[10] with two fundamental limitations: first, the General Assembly must make the basic policy choices that guide the exercise of its delegated authority, and second, there must be adequate standards to restrain any arbitrary or capricious exercise of the authority. *See, e.g.*, *Protz v. Workers' Comp. Appeal Bd. (Derry Area Sch. Dist.)*, 161 A.3d 827, 834 (Pa. 2017). With respect to basic policy choices, the Public School Code of 1949, 24 P.S. §§ 1-101 – 27-2702, comprehensively sets forth the General Assembly's policy decisions with respect to maintaining a thorough and efficient education system in our Commonwealth, as mandated by Article III, Section 14 of our Constitution. PA. CONST. art. III, § 14 ("The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth."); *see also Hazleton Area Sch. Dist. v. Zoning Hearing Bd*., 778 A.2d

---

[10] As previously discussed, *see* pp. 20-21, in *Weaverland* this Court decided that the delegation of identical authority by the General Assembly to the Superintendent of Public Instruction did not violate Article II, Section 1 of our Constitution. *Weaverland,* 106 A.2d at 814. We likewise concluded that the delegation language was not unconstitutionally vague. *Id.* at 814-15. *Weaverland* involved the predecessor to the current Section 242.1 which contained nearly identical language. We have not been asked to revisit *Weaverland* in this appeal.

1205, 1213 (Pa. 2001) ("The purpose of the School Code is to establish a thorough and efficient system of public education, to which every child has a right.").

Given the comprehensive breadth of the Public School Code which enunciates the General Assembly's policy on public school education, its dictates must be applied by the Secretary under his statutory administrative authority to determine the educational merit of a proposed independent school district.[11]  The analysis is constrained by these policy decisions so that the Secretary's own preferences are not valid considerations regarding good education policy.[12]  In this regard, we agree with the prior precedent of the Commonwealth Court in *Riegelsville II* and *Washington Township.  See Riegelsville II*, 17 A.3d at 991 ("[W]hen the Secretary exercises his [or her] discretion to determine whether a proposed transfer has 'merit from an educational standpoint,' he [or she] must be guided by the policy choices made by the legislature in the Public School Code of 1949 and not by his own personal sense of what constitutes good education policy."); *see also Washington Twp.*, 153 A.3d at 1184.

Accordingly, to determine whether an educational merits analysis under Section 2-242.1 may consider the financial implications of the proposed transfer, we must review the provisions of the Public School Code relating to legislative policy choices.  Such a review makes it abundantly clear that the General Assembly's educational policy choices

---

[11]  We do not foreclose the possibility that there may be other enactments of the General Assembly involving public education that may also be taken into account by the Secretary in making an educational merits determination.

[12]  Our appellate courts also provide an important limitation on the Secretary's authority, as his or her conclusions are subject to appeal to determine whether the analysis was appropriately guided by the Public School Code.  *See generally Protz*, 161 A.3d at 834.

reflect the integral role of school district finances.[13]    The Public School Code comprehensively addresses how school districts obtain funding, how finances are regulated, and instructs school districts on how they must account for their financial practices.  For instance, the General Assembly has established commissions to address the basic funding of public education and special education programs.  24 P.S. §§ 1-123, 1-122.  It has also implemented policy choices and directives relating to the financing of public education, in part by vesting the boards of directors in each school district with the necessary authority and power to levy and collect the taxes "[i]n order to establish, enlarge, furnish, operate, and maintain any schools … ."  24 P.S. §§ 5-507, 6-601 (relating to furnishing information regarding taxes and expenditures), 6-602 – 6-616.1, 7-707; *see also id.* §§15-1503-A, 25-2501 – 25-2526.1.  In so doing, it recognizes that funding is fundamental to providing facilities and resources necessary for a quality public education.

In regulating how school districts utilize funding, the Public School Code establishes minimum requirements for employing and paying qualified professional employees.  *Id.* §§ 11-1106.  In that regard, the Public School Code creates minimum pay requirements for regular and temporary teachers, coordinators of career and technical education, psychologists, and principals.  *Id.* § 11-1142.  It requires school districts to include in their annual budgets an appropriation to meet the amount of rentals for buildings and facility maintenance.  *Id.* § 7-784.  It regulates the purchase of furniture, equipment, textbooks and school supplies by school districts, *id.* § 8-807.1, and it regulates investment of school district funds.  *Id.* § 4-440.1.

---

[13] The centrality of school financing to effectuate the constitutional mandate of a thorough and efficient system of public education was recently highlighted in *William Penn School District v. Pennsylvania. Department. of Education*, 170 A.3d 414 (Pa. 2017).

The Public School Code also creates comprehensive accountability mechanisms. It includes provisions requiring school districts to submit yearly financial reports with budget statements, *id.* §§ 2-218, 6-687, 21-2133, and establishes auditing and reporting requirements. *Id.* §§ 24-401 – 24-2462. Records of these reports are required to be retained by the district for at least six years. *Id.* § 5-518. The General Assembly has created a framework for identifying and monitoring school districts in financial distress and to assist them in financial recovery through the development and implementation of recovery plans. *Id.,* §§ 6-601-A – 6-695-A. The General Assembly developed a special system to assess school districts' financial practices and establish public financial accountability. *Id.,* §§ 25-2501 – 25-2511 ("Keystone Educational Accountability"). Districts that use "best practices" because of demonstrated financial management "instill public confidence," while those who do not exhibit best practices are required to provide an action plan to remedy issues identified by the assessment. *See id.* §§ 25-2507-A – 25-2508-A. These provisions are supplemented by regulations in 22 Pa. Code Chapter 18, and together they aim to identify school districts with negative financial conditions that might impact their ability to provide and maintain educational programs for students and methods to rectify those conditions.

These provisions of the Public School Code reflect our General Assembly's unmistakable recognition that a school district's financial health is an essential factor in its ability to provide a suitable education to its students. To require the Secretary to attempt to fulfill his duty to ascertain the educational merits of a school district transfer under Section 242.1 without considering the issues of financial viability undermines his or her ability to make a meaningful determination. The Public School Code demonstrates

the legislature's obvious recognition that a school district cannot educate students without adequate resources. Educational resources are not free – teachers, buildings, school supplies, computers, etc. all need to be financed. To the extent that a proposed independent school district results in undermining the ability of the remaining school district to finance the educational needs of its students, that detriment is a legitimate consideration in the Secretary's analysis. For these reasons, in conducting a review of the educational merits of a proposed school district transfer petition, the Secretary may undoubtedly consider financial conditions that would result from the transfer.

The Commonwealth Court criticizes the Secretary's disapproval of the Coalition's petition based on his consideration of the negative impact on SHSD because that district's financial condition is currently troubled and it will remain so whether or not the petition is denied. *Borough of Highspire*, 228 A.3d at 594. Apparently, from its perspective, the departing students should be allowed off the sinking ship because it is going to sink with or without them on board. Respectfully, such considerations and weighing of interests are not in the purview of the Commonwealth Court. While the Secretary does not dispute that the denial of the Coalition's petition for the creation of an independent school district will not improve the financial condition of SHSD, it is for the Secretary to weigh that factor in determining the educational merits of the petition. In doing so, students in all of the affected school districts over time are part of the analysis. Moreover, the provisions of the Public School Code specifically designated to address districts in the "watch" status and those in financial distress, 24 P.S. §§ 6-601-A – 6-695-A, are the appropriate lens to view the timing of the ultimate outcome of the remaining school district and not the narrowly-focused view of parents in part of the district or the Commonwealth Court. It is

the Secretary, applying his "expert knowledge in the field of education" through the lens of the Public School Code, who makes the determination of educational merits in light of the factors.

Transfer petitions under Section 2-242.1 are factually unique and depend upon the circumstances raised in a particular case. In those petitions where financial conditions may play a role in the Secretary's assessment of educational merit, there should be no constraints on his or her ability to take them into consideration.[14] Moreover, it must be acknowledged that in reviewing a petition for educational merit, the Secretary must take a holistic approach, looking not just at the students who would be transferred, but at the students in each of the affected school districts. *See, e.g.*, *Washington Twp.*, 153 A.3d at 1181. No language in Section 242.1 requires the Secretary to limit his or her review only to the newly proposed school district, and neither the Secretary nor the Commonwealth Court have ever limited an educational merits analysis in this way.

Finally, we address the hypothesis of the Commonwealth Court that the taxable inhabitants of any geographical territory within a school district in "financial watch status"

---

[14] We reject the Commonwealth Court's contention that by taking the financial ramifications of a transfer into consideration, the Secretary impinges upon the duties of the court of common pleas and/or the State Board. The court of common pleas ultimately makes a mathematical calculation to determine the precise apportionment of state education subsidy and debt among the sending and receiving school districts. On the other hand, the Secretary's analysis scrutinizes the impact of the reapportionment of revenue, including subsidies and taxes on all of the affected school districts. Likewise, while the State Board will consider the financial impact of the proposed transfer, this review is conducted under a different test, i.e., whether the petition violates the adopted Board standards or express statutory standards that govern the organization of school districts. In at least one prior case, the Commonwealth Court has observed that there may be some overlap between the Secretary's educational merits review and the Board's duties in setting its standards for the organization of school districts. *Washington Twp.*, 153 A.3d at 1188 n.19.

could ever successfully petition for a transfer of students to another school district unless agreed to by the neighboring school district. *Borough of Highspire*, 228 A.3d at 593. The court stated that "the Secretary erred in finding the educational merits of the transfer to be outweighed by PFM's adverse financial projections, which are conjectural and beyond the scope of the Secretary's 'educational merits' review." *Id.* at 595. In its financial projections, PFM concluded that while the transfer would result in a decrease in the number of enrolled students, the overall effect would not allow SHSD to reduce costs significantly, since although the reduction in enrollment may permit some reduction in staffing, given the economies of scale at issue, it was not feasible for SHSD to consolidate its operation into a single building to achieve a material savings. Deputy Secretary's Findings of Fact, ¶ 96. The Commonwealth Court rejected the Secretary's consideration of this finding of fact because it was "conjectural."

Contrary to the Commonwealth Court's contention, here the Secretary did not create a blanket rule that when a remaining school district is designated as financially distressed, this designation prevents any possible finding that the transfer has educational merit. Instead, the Secretary took into consideration that the economies of scale in this case (and the associated results accruing therefrom) precluded a finding of educational merit. The Secretary's determination here does not preclude a finding of educational merit in a different case, regardless of a school district's "financial watch status" designation, where the economies of scale or other factors may differ.

We also disagree that the Secretary could not use PFM's financial projections in his educational merits analysis because they were "conjectural." The results of the PFM Report were included in a comprehensive set of Stipulations introduced prior to the

evidentiary hearing, and the language included in these Stipulations stated that the parties reserved all objections to the PFM Report and any findings based upon them – and that no witness from PFM would need to be available to testify based upon the Stipulations. In his opinion and order, the Secretary offered the following summary of the relevant administrative law with respect to stipulations:

> Commonwealth agencies are not bound by technical rules of evidence and … "[a]ll relevant evidence of reasonably probative value may be received," subject to reasonable examination or cross examination. 2 Pa. C.S.A. § 505. GRAPP further provides that parties may stipulate "as to a relevant matter of fact or the authenticity of relevant documents." 1 Pa. Code §35.155. This rule further provides that "[the] stipulations may be received in evidence at a hearing, and when so received shall he binding on the participants with respect to the matters therein stipulated." *Id.* A stipulation becomes the binding law of the case. *East Norriton Township v. Gill Quarries, Inc.*, 604 A.2d 763, 764 ([Pa. Commw.] 1992). The Commonwealth Court has also stated "[t]he Pennsylvania rule on stipulations is long-settled: parties may bind themselves, even by a statement made in court, on matters relating to individual rights and obligations, so long as their stipulations do not affect the court's jurisdiction or due order of business." *Id.*

Opinion and Order of the Secretary, 1/16/2019, at 29-30.

We find no error in the Secretary's reliance upon the PFM Report. It was entered into the evidentiary record by stipulation, and the Coalition agreed that PFM would not be required to offer a witness to testify regarding its contents. The Coalition could have, but did not, enter a proper objection to the introduction of the report into evidence and could have, but did not, call its own witnesses to contradict the findings. In short, if the Coalition had specific objections to the findings in the PFM Report, it should have raised and preserved them. Because it did not do so, the Secretary properly used them in developing his educational merits analysis.

**Conclusion**

In conclusion, the Secretary properly contemplated the impact of the transfer not just upon those living in the proposed independent school district, but also those in SHSD and MASD. He considered the educational merits of the proposed transfer by applying his expert knowledge, as guided by the Public School Code, to analyze the merits and demerits of the petition with respect to all affected students. He acknowledged the academic gains that would be enjoyed by the transferring Highspire students. Secretary's Op. and Order, 1/16/2019, at 33. He considered the facility shortages and increased class sizes that would impact the educations of the transferring Highspire students as well as the MASD students. *Id.* at 35. As carefully explained in his report, he also considered the financial detriment and corresponding threat to the educational opportunities to the students remaining in SHSD should a transfer occur. *Id.* at 33-36. In that respect, the Secretary looked at some of the resource and financial constraints that would be created by the proposed transfer. *Id.* Notably, although the Coalition now asks this Court to focus narrowly on the academic results Highspire students would enjoy if they were allowed to transfer to MASD,[15] the Coalition's petition relied on the limited financial resources available at SHSD to justify its request for a transfer.

---

[15] The Coalition's arguments seek to obscure the impact of the transfer upon the students who would remain at SHSD and those who are already attending MASD. For instance, the Coalition argues that even if the Secretary may consider a district's financial situation, every objective metric demonstrates that MASD provides a "superior educational environment" and therefore the petition must be approved. Coalition's Brief at 21. In urging the Court to focus solely upon the benefits to the transferring students, the Coalition overlooks how the transfer would impact the students remaining at SHSD. The record establishes that it would cause increased financial distress in SHSD leading to diminished educational opportunities. *See, e.g.,* Findings of Fact, 2/2/2018, ¶ 246 (providing that in the event of a transfer, SHSD "will not be able to provide the level of

The Secretary determined that the educational merits of the proposed petition in this case encompassed financial considerations in all of the affected school districts, and he justified this approach by citing to the stipulated facts as well as the policy goals rooted in the Public School Code. *See* Secretary's Op. and Order, 1/16/2019, at 28 (observing that the Public School Code reflects the General Assembly's policy choices and recognition that "a school district's financial health is an important factor in ensuring that the school district provides an adequate education to its students"). In applying his expert knowledge, the Secretary concluded that the benefits of the transfer did not outweigh its significant detriments.

For these reasons, we reverse the decision of the Commonwealth Court and remand for proceedings consistent with this opinion.

Chief Justice Baer and Justices Saylor, Todd, Dougherty, Wecht and Mundy join the opinion.

---

academic support that is needed in the district"); ¶ 256 (providing that "SHSD will be unable to sustain current class sizes if Highspire students exit").